704 So.2d 1375 (1997)
Leroy POOLER, Appellant,
v.
STATE of Florida, Appellee.
No. 87771.
Supreme Court of Florida.
November 6, 1997.
Rehearing Denied January 23, 1998.
*1376 Michael D. Lebedeker, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Leroy Pooler. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
*1377 Leroy Pooler was convicted of first-degree murder for the shooting death of his ex-girlfriend, Kim Wright Brown. He also was convicted of burglary and attempted first-degree murder with a firearm. The facts supporting these convictions are as follows. On January 28, 1995, Carolyn Glass, a longtime acquaintance of Kim Brown, told her that Pooler had said he was going to kill her because if he could not have her, no one else would. (Evidence showed that Kim Brown had begun seeing another man.) Two days later, Pooler knocked on the front door of the apartment where Kim and her younger brother, Alvonza Colson, lived with their mother. Seeing Pooler through the door window, Kim told him that she did not want to see him anymore. Alvonza opened the door halfway and asked Pooler what he wanted but would not let him in. When Pooler brandished a gun, Alvonza let go of the door and tried to run out the door, but he was shot in the back by Pooler. Pooler pulled Alvonza back into the apartment by his leg. Kim begged Pooler not to kill her brother or her and began vomiting into her hands. She suggested they take Alvonza to the hospital. Pooler originally agreed but then told Alvonza to stay and call himself an ambulance while Pooler left with Kim. However, rather than follow Pooler out the door, Kim shut and locked it behind him. Alvonza told Kim to run out the back door for her life while he stayed in the apartment to call for an ambulance. When he discovered that the telephone wires had been cut, he started for the back door, just as Pooler was breaking in through the front entrance.
Pooler first found Alvonza, who was hiding in an area near the back door, but when he heard Kim yelling for help, he left Alvonza and continued after Kim. When he eventually caught up with her, he struck her in the head with his gun, causing it to discharge. In front of numerous witnesses, he pulled her toward his car as she screamed and begged him not to kill her. When she fought against going in the car, Pooler pulled her back toward the apartment building and shot her several times, pausing once to say, "You want some more?" Kim had been shot a total of five times, including once in the head. Pooler then got into his car and drove away.
The jury recommended death by a vote of nine to three. The trial court found the following aggravators: (1) that the defendant had a prior violent felony conviction (contemporaneous attempted first-degree murder of Alvonza); (2) that the murder was committed during the commission of a burglary; and (3) that the murder was heinous, atrocious, or[1] cruel. The trial court found as statutory mitigation that the crime was committed while Pooler was under the influence of extreme mental or emotional disturbance, but gave that finding little weight. The court found the following proposed statutory mitigators had not been established: (1) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; (2) the defendant acted under extreme duress or under the substantial domination of another person; and (3) the defendant's age (he was 47).
As nonstatutory mitigation, the trial court found the defendant's honorable service in the military and good employment record, as well as the fact that he was a good parent, had done specific good deeds, possessed certain good characteristics, and could be sentenced to life without parole or consecutive life sentences. The only mitigator given considerable weight was Pooler's honorable military service; the others were given some to little weight. The trial court expressly rejected as unestablished nonstatutory mitigation that Pooler has a good jail record and an ability to adapt to prison life; that he has low normal intelligence; that he has mental health problems; that he is rehabilitable; that the homicide was the result of a heated domestic dispute; and that he is unlikely to endanger others and will adapt well to prison. Concluding that each of the three aggravators standing alone would outweigh the mitigating evidence, the court sentenced Pooler to death.
Pooler raises fifteen issues in this appeal. As his first argument, he contends that the prosecutor made an improper comment *1378 during voir dire about the presumption of innocence afforded criminal defendants when he said to a prospective juror:
Now, as we sit here, Mr. Pooler is presumed to be innocent.... That doesn't mean that he is innocent, but you have to presume that.
We disagree with Pooler's characterization of the comment. The prosecutor's statement was not an improper statement of the law, nor did it constitute an expression of the prosecutor's personal belief in Pooler's guilt.
Second, Pooler claims that the trial court erred in failing to instruct the jury on attempted first-degree felony murder in the count charging him with attempted first-degree murder with a firearm. Acknowledging that this Court in State v. Gray, 654 So.2d 552 (Fla.1995), held that there is no crime of attempted felony murder in Florida, Pooler nevertheless argues that had the jury been so instructed, his attempted first-degree murder conviction might have been based on that theory, and then that conviction as well as the two aggravators based on that conviction would have been struck down on the basis of Gray. First, defense counsel did not request an instruction on attempted felony murder. Thus, the issue is waived. Moreover, the argument makes little sense. Pooler was not entitled to an instruction on a non-existent crime.
Third, Pooler argues that the trial court erred in finding that the murder of Kim Brown was heinous, atrocious, or cruel (HAC). He relies on Lewis v. State, 398 So.2d 432, 438 (Fla.1981), in which this Court held that "a murder by shooting, when it is ordinary in the sense that it is not set apart from the norm of premeditated murders, is as a matter of law not heinous, atrocious or cruel." Pooler contends that the shooting death of Kim Brown was not accompanied by any additional acts that would set it apart from the norm of premeditated murders. In further support of his argument, Pooler also relies on Bonifay v. State, 626 So.2d 1310 (Fla.1993), wherein we held that the fact that the shooting victim begged for his life or received multiple gunshot wounds was insufficient to establish the HAC aggravator in the absence of evidence that the defendant intended to cause the victim unnecessary and prolonged suffering. However, we have also held that the fear, emotional strain, and terror of the victim during the events leading up to the murder may be considered in determining whether this aggravator is satisfied, even where the victim's death was almost instantaneous. James v. State, 695 So.2d 1229 (Fla.), petition for cert. filed, No. 97-6104 (U.S. Sept. 18, 1997); Preston v. State, 607 So.2d 404, 409-10 (Fla.1992); Rivera v. State, 561 So.2d 536, 540 (Fla.1990); Adams v. State, 412 So.2d 850, 857 (Fla.1982). Moreover, the victim's mental state may be evaluated for purposes of this determination in accordance with a common-sense inference from the circumstances. Swafford v. State, 533 So.2d 270, 277 (Fla.1988). In this case, the record contains evidence over and above the fact that the victim pleaded for her life and received multiple gunshot wounds. Kim Brown learned of Pooler's threat to kill her some two days before she was killed, giving her ample time to ponder her fate. Any doubt she may have had about the sincerity of Pooler's threat must have been dispelled when he visited her apartment that morning with a gun, forced his way in, and shot her fleeing brother in the back. One need not speculate too much about what was going through Kim Brown's mind during this time, as her fear was such that it caused her to vomit. Even after Kim succeeded in locking Pooler out of the apartment, he broke his way back in, whereupon she and her brother ran out of the apartment in an effort to escape. Once he caught up with Kim, Pooler struck her in the head with his gun and dragged her to his car as she screamed and begged for him not to kill her. Pooler's final words to her before killing her were, "Bitch, didn't I tell you I'd kill you?" and "You want some more?" We conclude that the circumstances of the victim's death support the trial court's finding that the HAC aggravator had been established.
Pooler's fourth claim is that the trial court erred in finding that the prior violent felony aggravator had been established where the underlying felony (in this case, the attempted murder of Alvonza Colson) was committed contemporaneously with the capital *1379 felony. However, as Pooler concedes, we have rejected this argument in the past. Contemporaneous convictions prior to sentencing can qualify as previous convictions of violent felony and may be used as aggravating factors in cases where the contemporaneous crimes were committed upon separate victims. E.g., Windom v. State, 656 So.2d 432, 439 (Fla.1995); Zeigler v. State, 580 So.2d 127, 129 (Fla.1991); Correll v. State, 523 So.2d 562, 568 (Fla.1988); Lucas v. State, 376 So.2d 1149, 1152-53 (Fla.1979). We therefore find no error.
Fifth, Pooler challenges the trial court's finding that he had not established that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.[2] Our review of the record reveals that it contains competent substantial evidence to support the trial court's rejection of this mitigating circumstance. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990) (trial court may reject proposed mitigating factor if record contains competent substantial evidence to support rejection). There was no evidence that Pooler's capacity either to appreciate the criminality of his conduct or conform his conduct to the law was impaired at the time of Kim Brown's murder. Although Pooler presented expert testimony that his performance on various intelligence and cognitive tests was below-average to borderline, one of his own experts testified on cross-examination that in his opinion, Pooler's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was not impaired. There was also evidence revealing that Pooler was sufficiently intelligent to graduate from high school, receive an honorable discharge after six years of service in the Marine Corps, and hold down the same job for some seven years.
Sixth, Pooler asserts that the trial court erred in finding that Pooler had failed to establish that he was under extreme duress or under the substantial domination of another person at the time the murder was committed.[3] In Toole v. State, 479 So.2d 731, 734 (Fla.1985), we stated that "duress" refers not to internal pressures but rather to external provocations such as imprisonment or the use of force or threats. There was no evidence presented to support Pooler's assertion that he acted under extreme duress at the time of the murder. The fact that his former girlfriend had been seeing another man, even if it caused Pooler to become distraught, simply does not qualify as external provocation for purposes of this statutory mitigator.
The next five claims challenge the trial court's rejection of various nonstatutory mitigators requested by Pooler. In rejecting Pooler's proposed good jail record and demonstrated ability to adapt to prison life, the trial court referred solely to the testimony of Deputy Sheriff Arthur Rack, a classification officer at the Palm Beach County Jail where Pooler was housed prior to and during his trial. Specifically, the trial court relied on Rack's testimony that Pooler's classification file for that year contained a single disciplinary report for threatening another inmate. While the decision as to whether a particular mitigating circumstance is established lies with the judge, there must be competent substantial evidence to support that determination. Stano v. State, 460 So.2d 890, 894 (Fla.1984). We agree with Pooler that Rack's testimony regarding the reported threat[4] does not constitute competent substantial evidence to support the trial court's rejection of this particular nonstatutory mitigation. According to Rack, he did not personally investigate the incident and the report was never brought to a hearing or otherwise concluded because of "manpower shortage." Rack further testified that based upon the absence of any other reported incidents in Pooler's file, it could be presumed that he was a well-behaved inmate. Because the trial court based its finding solely on the uninvestigated report, we conclude that it was an abuse of discretion to reject this particular mitigation. However, in rejecting other proposed nonstatutory mitigation, the trial court referred to Pooler's *1380 presentence investigation (PSI) report, which revealed that Pooler had been arrested about twenty-six times between 1972 and 1994, had served five sentences in Louisiana between 1975 and 1988 for aggravated assault, aggravated assault with a deadly weapon, battery, and resisting an officer, and was placed on probation for a 1994 aggravated assault charge in Florida. The PSI report not only renders the trial court's above error harmless, but it also constitutes competent substantial evidence to support the trial court's finding that Pooler failed to establish both that he is rehabilitable and that he is unlikely to endanger others and would adapt well to prison. Thus, there was no abuse of discretion as to the rejection of those two proposed mitigating factors.
Pooler also takes issue with the trial court's rejection of his low-normal intelligence as nonstatutory mitigation. The trial court found that this was not established as mitigation because although his I.Q. tested at 80, Pooler's functional level was higher, as evidenced by his education, military service, and employment record. We find no abuse of discretion in the trial court's ruling.
The trial court further found that Pooler had not established that the murder was the result of a heated domestic dispute. Again, we find no abuse of discretion. Although the evidence established that Pooler had had a romantic relationship with Kim Brown, that relationship had ended. Nor was there any evidence the two had been in the middle of a heated dispute at the time of the murder. In any event, the trial court took into account Pooler's subjective view of his relationship with the victim when finding that Pooler was under the influence of extreme mental or emotional disturbance at the time of the murder.
Issue twelve, in which Pooler claims a denial of due process because the record on appeal did not contain the PSI report relied upon by the trial court in rejecting nonstatutory mitigation, is now moot because the record has since been supplemented.
The thirteenth issue we address is Pooler's claim that the trial court erred in departing from the sentencing guidelines for the offenses of attempted first-degree murder with a firearm and burglary of a dwelling while armed without issuing a written contemporaneous departure order. In Padilla v. State, 618 So.2d 165, 170 (Fla.1993), we reiterated that a sentencing judge must set forth his or her departure reasons in writing at the time of sentencing and cannot do so after the sentence has been imposed. However, we did not state that these written reasons had to be contained in an order. In this case, the sentencing guidelines scoresheet contained a section entitled "Reasons for Departure," under which the following language was handwritten: "Defendant has an unscored capital murder conviction arising from the same set of circumstances." The sentencing guidelines scoresheet was signed and dated February 23, 1996, the same day that Pooler was sentenced for the noncapital offenses. This was the same reason given orally by the trial judge at Pooler's sentencing. We therefore find no error.
Fourteenth, Pooler challenges the constitutionality of Florida's death penalty on numerous grounds. Specifically, he argues that the death penalty in Florida, both facially and as applied, is unconstitutional for the following reasons: (1) the standard jury instruction for the felony murder aggravator fails to limit the application of the death penalty and creates a presumption of death for felony murders; (2) permitting the jury to find aggravators by majority vote violates article I, sections 9, 16, and 17 of the Florida Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution; (3) the lack of judicial standards for ensuring competent capital defense representation in cases where the attorney is court-appointed leads to uneven application of the law; (4) the ambiguous role of the trial judge in a capital case (who on the one hand is largely bound by the jury's recommendation but on the other is supposed to be the ultimate sentencer) permits circumvention of constitutional errors because special verdicts are not required where multiple homicide theories are submitted to the jury and because the jury is not required to reveal what aggravating and mitigating circumstances were found; (5) the trial judge was selected by a racially discriminatory *1381 system (none of Broward County's forty-three circuit judges is black, despite a 13.5% representation in the county's population); (6) appellate review is no longer heightened; (7) the aggravating statutory factors are not interpreted in accordance with the rule of lenity but instead are very broadly interpreted against the defendant; (8) the contemporaneous objection rule institutionalizes disparate application of the law in capital sentencing; (9) the lack of special verdicts makes it impossible for a trial court to know what aggravating and mitigating circumstances the jury found; and (10) electrocution is cruel and unusual punishment in light of evolving standards of decency and the availability of less cruel but equally effective methods of execution. We have previously rejected most of these claims as meritless. See Hunter v. State, 660 So.2d 244, 252-53 (Fla.1995) (rejecting claims (1) and (6) above), cert. denied, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996); Fotopoulos v. State, 608 So.2d 784, 794 n. 7 (Fla.1992) (rejecting claims (3), (4), (8), (9), and (10) above). Likewise, we find challenges (2), (5), and (7) to be without merit.
Finally, we address Pooler's claim that the death sentence is disproportionate in this case, where the evidence showed that he and the victim had a domestic relationship. We disagree. We have never approved a per se "domestic dispute" exception to the imposition of the death penalty. As we explained in Spencer v. State, 691 So.2d 1062 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997), there have been cases involving domestic disputes in which we struck the cold, calculated, and premeditated (CCP) aggravator on the basis that the heated passions involved negated the "cold" element of CCP.[5] However, our reason for reversing the death penalty in those cases was that the striking of that aggravator rendered the death sentence disproportionate in light of the overall circumstances. E.g., White v. State, 616 So.2d 21 (Fla.1993); Santos v. State, 591 So.2d 160 (Fla.1991); Douglas v. State, 575 So.2d 165 (Fla.1991); Farinas v. State, 569 So.2d 425 (Fla.1990); see also Wright v. State, 688 So.2d 298 (Fla.1996) (finding death sentence disproportionate where aggravating circumstances of prior violent felony and commission during a burglary were all related to defendant's ongoing struggle with the victim and evidence in mitigation was copious); Nibert, 574 So.2d 1059 (death sentence vacated as disproportionate in light of all the mitigating evidence that should have been found where sole aggravating circumstance was HAC). Indeed, we have upheld the death penalty as proportionate in a number of cases where the victim had a domestic relationship with the defendant. See Spencer; Cummings-El v. State, 684 So.2d 729 (Fla. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 2460, 138 L.Ed.2d 216 (1997); Henry v. State, 649 So.2d 1366 (Fla.1994); Porter v. State, 564 So.2d 1060 (Fla.1990). In Spencer, we affirmed the defendant's death sentence for the murder of his wife where the trial court found the aggravating circumstances of prior violent felony conviction and HAC and a number of mitigating circumstances, both statutory and nonstatutory. In this case, the established mitigation was similar to that in Spencer but there was also the additional aggravator that the murder was committed during the commission of a felony. Thus, under the circumstances of this case and in comparison to other death cases, we cannot say that the death sentence is disproportionate.[6]
The convictions and sentences of Leroy Pooler are hereby affirmed.
It is so ordered.
*1382 OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
SHAW, J., concurs as to conviction, and concurs in result only as to sentence.
ANSTEAD, J., concurs in part and dissents in part with an opinion in which KOGAN, C.J., concurs.
ANSTEAD, Justice, concurring in part and dissenting in part.
I differ only with the majority's resolution of the issue of proportionality. On that issue, I would hold that our decision in a case involving virtually identical facts, Farinas v. State, 569 So.2d 425 (Fla.1990), mandates the imposition of a life sentence here.
In Farinas, the defendant confronted his former girlfriend in a setting similar to that involved herein:
On November 25, 1985, the victim and her sister drove their father to work. Farinas was waiting outside the home and followed the car. Farinas continued to follow the car after the two women dropped their father off at work and tried several times to force the victim's car off the road, finally succeeding in stopping her vehicle. Farinas then approached the victim's car and expressed anger at the victim for reporting to the police that he was harrassing her and her family.
When the victim's sister urged her to drive away, Farinas leaned into the vehicle and removed the keys from the ignition, ordered the victim out of the vehicle, and guided her by the arm to his car. After returning the keys to the victim's sister, Farinas drove away with the victim in his car despite the pleas of the victim and her sister. When Farinas stopped the car at a stoplight near the Palmetto Expressway, the victim jumped out of the car and ran, screaming and waving her arms for help. Farinas also jumped from the car and fired a shot from his pistol which hit the victim in the lower middle back. According to the medical examiner, this injury caused instant paralysis from the waist down. Farinas then approached the victim as she lay face down and, after unjamming his gun three times, fired two shots into the back of her head.
....
... Evidence introduced at trial established that Farinas ignored the victim's pleas for mercy. The fact that the victim jumped from the car and ran from Farinas while screaming for help indicates that the victim was in frenzied fear for her life. As noted by the trial court, after Farinas paralyzed the victim from the waist down with a gunshot through her spine, he approached her and fired two shots into the back of her head after unjamming the gun three times. The victim was fully conscious during the time he unjammed the gun and was aware of her impending demise from the defendant.
Id. at 427-31. Despite these circumstances, this Court concluded that the death penalty should not be imposed because the defendant acted under the influence of extreme mental or emotional disturbance:
During the two-month period after the victim moved out of Farinas' home, he continuously called or came to the home of the victim's parents where she was living and would become very upset when not allowed to speak with the victim. He was obsessed with the idea of having the victim return to live with him and was intensely jealous, suspecting that the victim was becoming romantically involved with another man. See Kampff v. State, 371 So.2d 1007 (Fla. 1979). We find it significant, also, that the record reflects that the murder was the result of a heated, domestic confrontation. Wilson v. State, 493 So.2d 1019 (Fla.1986). Therefore, although we sustain the conviction for the first-degree murder of Elsidia Landin and recognize that the trial court properly found two aggravating circumstances to be applicable, we conclude that the death sentence is not proportionately warranted in this case. Wilson; Ross v. State, 474 So.2d 1170 (Fla.1985).
Id. at 431. In addition to murder, Farinas was also convicted and sentenced for two other contemporary violent felonies arising from the same incident: armed burglary and armed kidnapping, just as Pooler has been *1383 convicted of the wounding of the victim's brother here.
Pooler cites to the trial court's refusal to follow our holding in Farinas that the circumstance of extreme emotional disturbance is entitled to significant weight. Instead, he notes that the trial court refused to consider the broken personal relationship between the parties on the basis that "women are entitled to the same protection of the law as anyone else." It is apparent that the trial court, in an apparent effort to vindicate women's rights by imposing the death penalty on Pooler, has misconstrued our prior decisions concerning the proper consideration of extreme emotional disturbance in determining an appropriate penalty. See, e.g., Farinas.
This Court has emphatically held that there is no "domestic relations" exception to the death penalty. See Spencer v. State, 691 So.2d 1062 (Fla.1996). However, just as emphatically, this Court has repeatedly held that the presence of an extreme emotional disturbance in a domestic encounter should be given significant weight; and we have repeatedly noted the prevalence and significance of such disturbances in murders occurring in domestic relations settings. Wright v. State, 688 So.2d 298 (Fla.1996); Wilson v. State, 493 So.2d 1019 (Fla.1986); Ross v. State, 474 So.2d 1170 (Fla.1985); Kampff v. State, 371 So.2d 1007 (Fla.1979). Indeed, Justice Rosemary Barkett, Florida's first, and, to date, only woman Supreme Court Justice, has traced this Court's treatment of this issue in great detail:
I do not suggest that there is an "unrequited love" exception to the death penalty. Nonetheless, this Court consistently has accepted as substantial mitigation the inflamed passions and intense emotions of such situations. In almost every other case where a death sentence arose from a lovers' quarrel or domestic dispute, this Court has found cause to reverse the death sentence, regardless of the number of aggravating circumstances found, the brutality involved, the level of premeditation, or the jury recommendation. See Blakely v. State, 561 So.2d 560 (Fla.1990) (death penalty disproportional despite finding of heinous, atrocious, or cruel, and cold, calculated, and premeditated); Amoros v. State, 531 So.2d 1256, 1261 (Fla.1988); Garron v. State, 528 So.2d 353, 361 (Fla.1988); Fead v. State, 512 So.2d 176, 179 (Fla.1987), receded from on other grounds, Pentecost v. State, 545 So.2d 861, 863 n. 3 (Fla.1989); Irizarry v. State, 496 So.2d 822, 825-26 (Fla.1986); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986); Ross v. State, 474 So.2d 1170, 1174 (Fla.1985); Herzog v. State, 439 So.2d 1372, 1381 (Fla.1983); Blair v. State, 406 So.2d 1103, 1109 (Fla. 1981); Phippen v. State, 389 So.2d 991 (Fla.1980); Kampff v. State, 371 So.2d 1007 (Fla.1979); Chambers v. State, 339 So.2d 204 (Fla.1976); Halliwell v. State, 323 So.2d 557 (Fla.1975); Tedder v. State, 322 So.2d 908 (Fla.1975); cf. Hamilton v. State, 547 So.2d 630 (Fla.1989) (aggravating circumstances and judgment of guilt reversed, remanded for new trial). The Court has even reversed death sentences where, as in Porter's case, the defendant murdered two people during the same violent outburst. See Garron; Wilson; Phippen; cf. Hamilton. Generally when we have affirmed death sentences in analogous situations, we have noted that the defendants had prior, unrelated convictions of violent felonies. See Hudson v. State, 538 So.2d 829 (Fla.) (defendant was on community control for sexual battery when he committed the murder), cert. denied, 493 U.S. 875, 110 S.Ct. 212, 107 L.Ed.2d 165 (1989); Lemon v. State, 456 So.2d 885 (Fla.1984) (defendant committed murder shortly after serving prison sentence for assault with intent to commit first-degree murder), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985); Williams v. State, 437 So.2d 133 (Fla.1983) (defendant had been convicted of aggravated assault, and was on parole for possession of firearm by a convicted felon, when he committed the murder), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164 (1984); King v. State, 436 So.2d 50 (Fla.1983) (defendant had a prior conviction of manslaughter for killing a woman with an axe), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 163 (1984). There is no finding that Porter had any *1384 prior, unrelated violent felony convictions before this case arose.
Porter v. State, 564 So.2d 1060, 1065 (Fla. 1990) (Barkett, J., concurring in part and dissenting in part).
This does not mean that spouses, children, siblings, parents or intimate friends are entitled to less protection of the law. It does mean, however, that the extreme mental or emotional breakdowns that often occur in such relationships cannot be ignored or given no weight in determining whether the crime is among the worst of the worst and "the most aggravated and the least mitigated" for which the death penalty is reserved. State v. Dixon, 283 So.2d 1 (Fla.1973). As Justice Barkett in Porter has previously documented, this Court has invariably concluded that killings occurring under the "inflamed passions and intense emotions of such situations" do not fall into that extreme category, even where "the defendant murdered two people during the same violent outburst."
As noted above, this case is almost identical to Farinas. Indeed, the only significant difference in the two cases is that there was no nonstatutory mitigation found in Farinas, while there is extensive nonstatutory mitigation present here. This mitigation is briefly described by the majority:
As nonstatutory mitigation, the trial court found the defendant's honorable service in the military and good employment record, as well as the fact that he was a good parent, had done specific good deeds, possessed certain good characteristics, and could be sentenced to life without parole or consecutive life sentences. The only mitigator given considerable weight was Pooler's honorable military service; the others were given some to little weight. The trial court expressly rejected as unestablished nonstatutory mitigation that Pooler has a good jail record and an ability to adapt to prison life; that he has low normal intelligence; that he has mental health problems; that he is rehabilitable; that the homicide was the result of a heated domestic dispute; and that he is unlikely to endanger others and will adapt well to prison.
Majority op. at 1377. Hence, Pooler's plea for a life sentence is supported not only by our prior treatment of similar cases like Farinas, but also by the presence of substantial mitigation not found in Farinas.
KOGAN, C.J., concurs.
NOTES
[1] The sentencing order uses the conjunction "and."
[2] § 921.141(6)(f), Fla. Stat. (1995).
[3] § 921.141(6)(e), Fla. Stat. (1995).
[4] The report was not admitted into evidence.
[5] Although the CCP aggravator was not found in this case, the evidence does not even suggest that Kim Brown was killed during a heated domestic dispute or in a sudden fit of rage. To the contrary, Pooler had previously announced to a mutual acquaintance his intention to kill Kim Brown. There was no evidence that there had been any exchange of words between Pooler and Kim Brown on the day of the murder.
[6] This case is clearly distinguishable from Farinas v. State, 569 So.2d 425 (Fla.1990), in which the defendant attacked only the victim. Here, Pooler not only killed the victim but also shot her brother in the back as he was attempting to flee.