616 So.2d 21 (1993)
Reginald S. WHITE, Appellant,
v.
STATE of Florida, Appellee.
No. 75571.
Supreme Court of Florida.
March 25, 1993.
James Marion Moorman, Public Defender and Paul C. Helm, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Reginald S. White appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm White's *22 conviction of first-degree murder but find that proportionality requires us to reduce his sentence to life imprisonment without parole for twenty-five years.
The record reflects that White and the victim, Melinda Scantling, had dated for some time and that, after their relationship ended, White and Scantling had several altercations. On March 1, 1989, Scantling obtained a restraining order enjoining White from committing acts of violence against her and excluding him from her residence for one year. On July 7, 1989, Scantling was accompanied by a male friend to a party. Scantling and her companion returned to her apartment at approximately 2:30 a.m. As they were sitting on Scantling's couch talking, White broke into the apartment and hit Scantling's companion several times with a crowbar. Scantling and her companion were able to wrestle the crowbar from White. As White and Scantling's companion continued to fight, Scantling hit White several times on the leg with the crowbar and left him bleeding. Scantling's companion forced White to the floor and held him there until sheriff's deputies arrived. White was charged with burglary, assault, and aggravated battery, and was subsequently convicted of these offenses.
On July 9, 1989, while in jail as a result of this incident, White told another inmate that, if he [White] was given bond, he was going to kill Scantling. The inmate testified at trial to that effect.
At approximately 4:30 p.m. on July 10, 1989, White went to a pawnshop and redeemed a shotgun he had previously pawned. The pawnbroker testified that White was a regular customer and did not appear to be under the influence of alcohol or drugs. At approximately 5:00 p.m. on July 10, 1989, three witnesses testified that as Scantling was leaving work, they saw White drive rapidly into the parking lot, and stop a few feet from Scantling. One of the eyewitnesses testified that White got out of the car with a shotgun and shot Scantling after she screamed and turned to run. Furthermore, the witness testified that, after Scantling fell face down, White approached her and fired a second shot into her back. As White returned to the car, he told one of the eyewitnesses, "Deke, I told you so," and then quickly drove away.
A cab driver testified that at approximately 5:40 p.m. on July 10, 1989, he was dispatched to pick up White at a specific location. When the cab driver arrived, White's car was parked on the grass and appeared to have come from a side street, run over the curb, and broken its wheels. The cab driver stated that White did not appear to be intoxicated and that he seemed to be in a very good mood.
The pawnbroker testified that, at approximately 6 p.m. on the same day, White returned to his store and redeemed a revolver that White had also previously pawned. At this time, the pawnbroker noticed that White had bloodstains on his pants.
The record further reflects that White was located and arrested the next day, July 11, 1989. White did not resist the arrest. The arresting officer noticed that White was limping and had dried blood on his clothing. White spoke with the two detectives who were transporting him to the police station. One of the officers testified that White stated that while he was in Raiford he "got to sit in the electric chair." White then allegedly stated that he would now "have to sit in it for real."
In the guilt phase of the trial, the parties made the following stipulation concerning a urine test taken on July 11, 1989:
1. That a urine sample was taken from [White] on July 11, 1989, by personnel of the Hillsborough County Jail.
2. That this urine sample was forwarded to Roach [sic] Laboratories, Atlanta, Georgia, where it was analyzed.
3. That such analysis showed that [White's] urine sample contained residue of cocaine, valium and marijuana.
4. That no quantitative tests were performed and no tests are available that would indicate whether the cocaine, valium and marijuana were ingested before or after 5:00 p.m... . July 10, 1989.
*23 White's sister testified as to White's drug addiction. She stated that she had sixteen years of experience taking disability claims for the Social Security Administration and counseled heroin addicts for her church. She stated that White had begun using marijuana in college before she moved to Tampa in 1973 and, when she returned in 1981, he had progressed to harder drugs. She testified that, by July 4, 1989, six days before this incident, "we were dealing with an animal," and that she sought help for him by calling defense counsel, a judge, a probation and parole counselor, and a mental health clinic, but that no one would help because he had not done anything violent. She further testified that White had been acting "very bizarre," that he normally was very articulate, and that his speech had become slurred. She also stated that his appearance had deteriorated, his nose was running, his eyes were red and sunken, and that he had lost twenty-five pounds in a few days.
White's sister also testified that, in the early morning hours of July 10, 1989, White called her and said that he needed help. White told his sister: "I need to talk to daddy. Please tell me where daddy is. Where is daddy? I got to get to daddy. I need to tell him something. I've got to go with him." She explained that their father had died in 1984. She also testified that, when White called her around 2:30 a.m. on July 10, 1989, he was very intoxicated. The prior evening, White had come to her house around 5:00 or 5:30 p.m. She stated that he was dirty, his teeth had not been brushed, his clothes were bloodstained, and that he smelled bad. She stated that, in her opinion, he was intoxicated. She also testified:
Reggie hasn't always been crazy. He's a very intelligent person. But when a person is taking drugs, they aren't intelligent. And whatever he got a hold of made him as crazy as anybody I've seen and in sixteen years of going to state mental hospitals I've seen a lot of crazy people.
On cross-examination, the prosecutor brought out that White's sister had warned him to not take drugs and that it was White's conscious decision to do so.
A friend of White's testified that he had known him for twenty-five years and that, during the past year, every time he saw White he was using drugs. He stated that they had smoked cocaine and marijuana together, and that White also took valium. The friend stated that, in early July, 1989, White was "everywhere crack was" and that every time he saw White he was smoking crack cocaine. Further, he testified that, when White smoked crack, White would also take three or four valiums. He also testified that he saw White between 3:30 and 4:30 p.m. on July 10, the day Scantling was killed, and that White had just purchased a substantial amount of crack cocaine and was "packing a stem, getting high." The friend testified that White was very intoxicated when he left driving "like a bat out of hell." The jury was instructed on the issue of voluntary intoxication, rejected it, and found White guilty of first-degree murder.
In the penalty phase, the State requested that the jury be instructed on two aggravating circumstances: 1) that White had been previously convicted of a violent felony, specifically, the burglary with assault and the aggravated battery that occurred on July 7, and 2) that the murder had been committed in a cold, calculated, and premeditated manner.
A forensic psychiatrist, who testified on White's behalf, testified that he had examined White five times after the murder, the first occurring on July 13, 1989. He stated that on that date White displayed withdrawal symptoms and that a test showed traces of cocaine, marijuana, and valium. He stated that White told him that, in the six days before the crime, he had consumed five ounces of cocaine, some heroin, forty valiums, and fifty-five to sixty marijuana cigarettes. The doctor explained that he did not know when the drugs were taken but that White's withdrawal symptoms were consistent with the six-day period of drug use reported by White. The psychiatrist concluded that White was under the influence of extreme mental and emotional *24 disturbance at the time of the homicide and that White's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
A psychologist testified in regard to a series of tests that he gave White beginning on July 12, 1989. The psychologist stated that, in his opinion, White was acting under extreme internal distress because of his emotional problems, addiction, and obsession with Scantling. Furthermore, he stated that White's excessive use of cocaine prevented him from controlling his anger and allowed him to act on it.
In the final arguments, the prosecutor stated:
What is life imprisonment? What can one day in jail?
Well, you can laugh. You can cry. You can read a book. You can watch TV. In short, you live to learn of the wonders that the future holds. In short, it is living. People want to live.
If Miss Scantling had a choice of being in prison for life or being in that photograph with a shotgun hole in her back, what choice would Melinda Scantling have made? The answer is clear. She would have chosen to live, but, you see, she didn't have that choice. You know why? Because that man, right there, decided for himself that Melinda Scantling should die. And for making that decision, for making that decision, he too deserves to die.
While this statement urges the jury to consider improper factors, defense counsel did not object to its use. The jury recommended the death penalty by a vote of eleven to one.
Following the jury's recommendation of death, the trial judge directed counsel to be prepared to argue at sentencing whether the judge was bound by the jury's recommendation unless the judge found that the jury was unreasonable. The prosecutor responded: "You have to find them unreasonable and then override, judge, but you still have the ability to override a jury's recommendation." The trial judge, in his sentencing order, found that the existence of both aggravating factors asserted by the State: 1) that White had been previously convicted of felonies involving the use of violence and 2) that the offense for which White was to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court also found the following mitigating circumstances:
1. The capital crime for which the Defendant is to be sentenced was committed while he was high on cocaine and while he (questionably) was under the influence of extreme mental or emotional disturbance.
2. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law (questionably) was substantially impaired.
3. Any other aspect of the Defendant's character or record and any other circumstances of the offense, to wit: Personality change caused by a drug problem; upset and jealous caused by severed relationship with victim.
In making the determination that the death penalty was warranted in this case, the trial judge made the following findings of fact and conclusions of law:
The Court further finds that the jury was reasonable in concluding that the aforesaid Aggravating Circumstances warranted the Death Penalty and were not outweighed by the aforesaid Mitigating Circumstances.
"A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). "A jury recommendation of death, reflecting the conscience of the community, is entitled to great weight." Grossman v. State, 525 So.2d 833, 846 (Fla. 1988).
It is illogical "great weight" means one thing when applied to a life recommendation but something else when applied *25 to a death recommendation. The Court is therefore bound to follow the jury's recommendation of death in the instant case since there is a reasonable basis for such recommendation and the Court is unable to find that no jury, comprised of reasonable persons, could have ever returned such recommendation.
The case is subject to automatic review and it is respectfully suggested that the Florida Supreme Court:
1. Recede from Tedder.

2. Unequivocally hold that any sentence of death, regardless of the jury's recommendation, is clothed with the presumption of correctness and will not be reversed absent a clear abuse of discretion on the part of the sentencing judge in following the procedure mandated by Florida's death statute.
3. Refrain from substituting its own judgment as it apparently did in Ross v. State, 474 So.2d 1170 (Fla. 1985), wherein the trial court's death sentence, following a jury's death recommendation, was vacated without any mention of the jury having been unreasonable in its recommendation.
In this appeal, White raises two claims concerning the guilt phase of this trial. First, he asserts that, with regard to the intoxication defense, the trial judge improperly excluded experts' opinion testimony that White was intoxicated at the time of the offense. Second, White asserts that the trial judge should have excluded the voluntary statements he made to the police officer while being transported to the jail. We find that neither of these points has merit and need not be discussed.
In regard to the penalty phase, White raises four claims: 1) that the prosecutor violated White's right to due process by improperly urging the jurors to consider matters outside the scope of their deliberations during the penalty phase of the trial; 2) that the trial court violated the Eighth and Fourteenth Amendments by instructing the jury on and finding that the murder had been committed in a cold, calculated, and premeditated manner; 3) that the trial court gave undue weight to the jury's recommendation of death and failed to make an independent judgment of whether the death penalty should be imposed; and 4) that the death sentence was disproportionate to the circumstances of this offense.
We will address White's second and fourth claims together because their disposition require that we reduce White's sentence to a life sentence without parole for twenty-five years. We agree with White that the trial judge erred in instructing the jury on and finding that this murder was committed in a cold, calculated, and premeditated manner. While the record establishes that the killing was premeditated, the evidence of White's excessive drug use and the trial judge's express finding that White committed this offense "while he was high on cocaine" leads us to find that this aggravating factor was not established beyond a reasonable doubt and that the jury should not have been instructed that it could consider this aggravating factor in recommending the imposition of the death penalty. As a result of this conclusion, the death sentence is based upon one aggravating factor and three mitigating factors, each of which is fully supported by the record. Given the evidence of White's drug use and that he was under the influence of extreme mental or emotional disturbance, as well as the evidence that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, we find that the death sentence in this case is disproportionate when we compare it with other cases in which we imposed a life sentence. See e.g., Downs v. State, 574 So.2d 1095 (Fla. 1991); Penn v. State, 574 So.2d 1079 (Fla. 1991); Farinas v. State, 569 So.2d 425 (Fla. 1990); Cheshire v. State, 568 So.2d 908 (Fla. 1990); Blakely v. State, 561 So.2d 560 (Fla. 1990); Irizarry v. State, 496 So.2d 822 (Fla. 1986).
While we have found that the death sentence may be imposed in cases involving domestic disputes, in which the defendant had previously committed violent felonies, see, e.g., Lemon v. State, 456 So.2d 885 (Fla. 1984), cert. denied, 469 U.S. 1230, 105 *26 S.Ct. 1233, 84 L.Ed.2d 370 (1985); Williams v. State, 437 So.2d 133 (Fla. 1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164 (1984); King v. State, 436 So.2d 50 (Fla. 1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 163 (1984), those cases did not involve defendants whose mental mitigating factors were as extensive as those presented in the record of this cause. Further, as we stated in McKinney v. State, 579 So.2d 80 (Fla. 1991), "This Court has affirmed death sentences supported by one aggravating circumstance only in cases involving `either nothing or little in mitigation.'" Id. at 85 (quoting Nibert v. State, 574 So.2d 1059, 1163 (Fla. 1990), and Songer v. State, 544 So.2d 1010, 1011 (Fla. 1989)). Given these circumstances and our duties of appellate review as set forth in State v. Dixon,[1] we conclude that the presence of only one valid aggravating circumstance in this case is offset by the substantial mitigating evidence in the record. Consequently, we find that this death sentence is disproportional when compared with similar capital cases where this Court has vacated the death sentence and imposed life imprisonment. McKinney.
While the comment of the prosecutor in the penalty phase of this proceeding does not affect the disposition of this case, we feel that it is important to emphasize that this Court has previously found that this same argument "oversteps the bounds of proper argument." Taylor v. State, 583 So.2d 323, 330 (Fla. 1991). Continual use of this type of argument can well result in the expenditure of additional taxpayer funds to retry capital cases due to the prosecutor's failure to abide by established legal principles.
We reject the trial judge's suggestion that we "recede from Tedder and hold that any sentence of death, regardless of the jury's recommendation, is clothed with a presumption of correctness and will not be reversed absent a clear abuse of discretion on the part of the sentencing judge." To do so would effectively result in this state's death penalty being declared unconstitutional. It appears that the trial judge would like us to return to the era of unbridled discretion that resulted in Florida's prior death penalty statute being declared unconstitutional.
Accordingly, we affirm White's conviction and, for the reasons expressed, reduce his sentence of death to life imprisonment without the possibility of parole for twenty-five years.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
SHAW, J., concurs in result only.
NOTES
[1] 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).