PER CURIAM.
 

 James Daniel Turner appeals his conviction for first-degree murder of Renee Howard and his sentence of death. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Turner’s convictions and sentences.
 

 FACTS AND PROCEDURAL HISTORY
 

 The record reflects that Turner had been sentenced to jail in Newberry County, South Carolina, for a violation of probation stemming from a felony battery charge. While incarcerated at that location he was primarily assigned to perform various duties at the local sheriffs office and was given special privileges because he was considered trustworthy. His position provided him unrestricted access to
 
 *216
 
 most of the sheriffs office, including the keys to vehicles parked adjacent to the office. Despite being scheduled to be released from the facility at the end of 2005, on September 28, 2005, Turner escaped from the Newberry County Jail in a stolen Newberry County Office Sports Utility Vehicle (SUV). The SUV was discovered by local employees in the parking lot of a business located in St. Johns County, Florida the next day. Local law enforcement officials found Turner’s identification card and multiple rocks of crack cocaine in the stolen vehicle.
 

 On September 30, 2005, two hotel guests saw Turner lurking around the Comfort Inn located in St. Augustine. At approximately 9:30 a.m., one of the housekeepers employed at the Comfort Inn observed Turner obtaining ice. Another housekeeper also saw Turner that morning and said “good morning” to him, to which he responded “good morning.” Later that morning, Turner approached one of the housekeepers and asked her for a towel. A third housekeeper also encountered Turner about an hour before the subject murder and greeted him, but he did not respond.
 

 That morning, Renee Howard, her four children ages eighteen, fourteen, two, and ten months, Howard’s eight-month-old granddaughter, and Stacia Raybon occupied room 210 of the motel, which was located on the second floor. Raybon testified that early that morning on the way to obtain breakfast, the defendant passed them, “almost pushing [them] off the sidewalk.” Shortly thereafter, Howard drove her son to work and daughter to school, taking two of the other three children with her in a champagne colored Ford F-150 pick-up truck. Howard returned to the motel and Raybon was on the way downstairs to assist Howard in gathering the children when she noticed Turner outside room 210. Howard, Raybon, and the three remaining children returned to the room to prepare to check out of the motel.
 

 The record reflects that while preparing bottles at the rear of the room for the children, Raybon saw a flash of light hit the mirror as the door of the room suddenly opened. She then saw Turner go toward Howard. Turner appeared to strike Howard in the midsection and then turned and proceeded to attack Raybon. Raybon crouched on the floor in the rear of the room and buried her face in her hands. Turner pulled Raybon up by the arm and stabbed her in the elbow. Immediately after stabbing Raybon, Turner noticed Howard move back toward the entry door of the room and Turner turned and directed his attention to her for the second time. Turner’s movement afforded Raybon time to grab her purse, rush into the bathroom, and lock herself inside.
 

 While in the bathroom, Raybon heard “loud hitting noises” in the room and the children screaming. Raybon then heard water running in the sink, which was located immediately outside the bathroom door. Turner attempted to force his way into the bathroom, and after he failed multiple times, Raybon asked Turner to release one of the children to her. Turner demanded money, and, after searching her purse, Raybon slid $5 and several credit cards under the bathroom door. Turner slid the $5 back under the door to her and told Raybon to keep it. Turner then brought one of the children to the bathroom door and allowed the child to enter the area occupied by Raybon. After Raybon pleaded for Turner to leave her and the children alone, Turner ordered Raybon to wait ten minutes before exiting the room. Approximately one minute later Raybon heard the entry door of the room close. When Ray-bon finally exited the bathroom, she dis
 
 *217
 
 covered Howard’s motionless body on the floor.
 

 After Turner left, Raybon tried to call 911 from the hotel room but was unable to connect. She then ran out of the room, screaming for help, and encountered one of the housekeepers, who gave her use of a cell phone. Shortly thereafter, the police arrived and Raybon provided a description of both Turner and Howard’s truck, which was missing after the attack. The police secured the area and initially believed that one of the children was missing. However, after conducting a thorough search of the room, the missing child was located under blankets in the rear of the room.
 

 The St. Johns County Sheriffs Office issued a “be on the lookout” for Howard’s truck, warning officers that there might be a three-year-old child in the vehicle with a dangerous person. Approximately five miles away from the Comfort Inn, Deputy Graham T. Harris, driving a marked police car, spotted the truck. Deputy Harris eventually caught up to the vehicle and activated his overhead lights. Deputy Harris testified, “Next thing I see when I pull over to the side, I see the reverse lights coming straight at my patrol car, boom, hit it, rear-end hit my front end, eventually knocked out my siren.” The truck then moved in a forward direction, pulled away from the police car, and proceeded to move full speed at the driver side of the police vehicle. Deputy Harris accelerated to escape the collision, and then the truck accelerated behind the patrol car as if to ram the patrol car from behind. Deputy Harris drove away from the scene with the truck in pursuit. Eventually, after numerous attempts at ramming the patrol car, the truck collided with a guard rail and came to a complete stop. Turner exited the truck, looked at Deputy Harris, and then jumped off the Deep Creek Bridge into the creek below.
 

 Subsequent to this roadway altercation, multiple deputies arrived at the Deep Creek Bridge. With canine assistance, Turner was located in the creek below. The deputies issued numerous commands for Turner to surrender, none of which were obeyed. After the canine was ordered to attack Turner, and Turner attempted to drown the animal, he eventually surrendered to the authorities. During the standoff and eventual arrest, Turner was heard saying, “I did not do it,” “Shoot me, just shoot me,” “I didn’t do it, the other guy did,” and he continuously identified himself as “Ricky.” Stacia Raybon’s two credit cards were found in Turner’s possession when he was arrested.
 

 On October 19, 2005, Turner was indicted for the following charges: (1) first-degree felony murder; (2) attempted first-degree murder; (3) grand theft of a motor vehicle; (4) home invasion robbery with a deadly weapon; and (5) aggravated assault on a police officer.
 

 First Trial
 

 The first trial ultimately ended in a mistrial. During voir dire, the trial court asked the potential jurors if any of them had any physical problems that would make it difficult for them to serve on a jury and, while one potential juror responded, juror Gard did not. Neither the State nor the defense moved to strike juror Gard for cause or attempted to utilize a peremptory challenge, and the jury was selected with juror Gard as a member of the panel. The following day, juror Gard delivered a letter to the trial court indicating that he suffered from a seizure disorder, but that he had it under control with medication and lifestyle change. He also attached a note from his physician indicating his disorder “becomes worse during times of stress” and asking the court to excuse him from jury duty.
 

 
 *218
 
 The trial court held a hearing with regard to juror Gard’s letter. Juror Gard explained that his disorder was under control and that he would generally know in the morning if a seizure was going to occur that day. In response to questions with regard to why he did not mention the disorder during voir dire, juror Gard explained that he did not think it was going to be an issue and that he “wanted to serve ... to go through the process like the letter said.” Turner moved the trial court to excuse juror Gard for cause. He claimed that juror Gard did not disclose this information because he had an agenda, and that he intentionally withheld information so he could serve on the jury. The trial court refused to strike juror Gard for cause and also denied Turner’s request for an additional peremptory challenge. Juror Gard remained on the jury.
 

 At 6:48 p.m., while the jury was deliberating after conclusion of the evidence, the trial court was advised that juror Gard had a seizure and had to be taken to the hospital. At the time of the seizure, the jury had decided four of the five counts and two alternate jurors were sequestered. After continued discussion and research, the trial court relied on
 
 Williams v. State,
 
 792 So.2d 1207 (Fla.2001), and noted that this Court had ordered a new trial in that case because the trial court substituted an alternate juror after deliberations began. The trial court then discussed
 
 Williams:
 

 I mean, looking at it, that’s not a case that I would have seated an alternate in either because that’s just part of the deliberative process, that she can’t make a decision. It was not a situation where somebody becomes unavailable because they fall ill. But I don’t know that this case provides an option.
 

 So I don’t know whether or not you want to waive it and your client wants to seat [an alternate] and have him continue or not.
 

 Defense counsel requested an opportunity to speak with Mr. Turner in private, and after a brief recess, announced:
 

 After reviewing the case and in light of the circumstances of the case and after conversations with Mr. Turner, we’re going to ask the Court for a mistrial in the case.
 

 The State did not object, and the trial court declared a mistrial.
 

 Second Trial — Guilt Phase
 

 Prior to jury selection for the second trial, Turner filed a motion to dismiss the charges against him alleging that the Double Jeopardy Clauses in both the Florida and United States Constitutions precluded the State from retrying him. The motion stated in part:
 

 Defendant was placed in a position that he either had to waive his request for a mistrial or have an alternate juror seated to replace the juror who became ill after over four hours of deliberations. The twelve person jury who had been selected and sworn had reached an agreement on four of the five counts, leaving the Defendant -with the only option of requesting a mistrial.
 

 At the subsequent hearing, Turner asked the trial court to find that the mistrial had been “declared over defendant’s objection” and to apply the standard of “manifest necessity.” The trial court noted that Turner had never before suggested a double jeopardy violation. The trial court denied the motion to dismiss.
 

 At trial, the State presented the testimony of multiple Florida Department of Law Enforcement crime lab analysts. Analyst Steven Platt testified with regard to the procedures for collecting the evidence from room 210. Analyst Gregory Brock established that there was a positive DNA
 
 *219
 
 match for James Turner for blood found on the bathroom door frame. He further testified that blood on a doorknob in the hotel room was a positive DNA match for Renee Howard, Stacia Raybon, and Turner. Evidence was presented that the shoes Turner was wearing at the time he was apprehended matched a bloody footprint found on a sheet of paper located in the hotel room. Finally, Dr. Terrence Steiner, the pathologist who performed the autopsy of Renee Howard, testified that the cause of death was shock and blood loss due to multiple stab wounds. Howard had sustained fifteen stab wounds.
 

 The defense did not present any evidence. The jury returned a verdict of guilty on all five counts.
 

 Penalty Phase
 

 The State presented three witnesses during the penalty phase. The pathologist testified that a cut he found on Howard’s hand was a defensive wound. He was also of the opinion that Howard was alive when the stab wounds were inflicted, and he opined that a few of the wounds “should have caused some pain.” The State also presented victim impact statements from the victim’s grandmother and oldest son. Finally, copies of a judgment and sentence from Larens County, South Carolina, to establish that Turner was under a sentence of imprisonment at the time of the incident were placed in evidence.
 

 The defense presented multiple witnesses during the penalty phase. Two of Turner’s stepdaughters testified that he was a good stepfather. The grandmother of his stepchildren corroborated that he was a good stepfather. Turner’s brother testified that the defendant began drinking with his uncles at a very young age and also helped them deal drugs.
 

 The defense presented expert testimony with regard to the effect of crack cocaine use on the brain. An expert testified that Turner entered a drug rehabilitation facility in 1994 and, while undergoing treatment, attempted to commit suicide. During cross-examination, the expert admitted that Turner’s cocaine use influenced his actions on the day of the murder, but did not necessarily cause those actions. He further was of the view that at the time of the murder, assuming Turner had gone at least twelve hours without crack cocaine, he would have been either depressed and subdued or anxious and hypervigilant.
 

 Finally, a psychologist testified that although he did not find that Turner suffered from significant brain damage, he found many cognitive defects. He testified that Turner’s biggest deficits involved decision making, judgment, planning, and impulse control. On cross-examination, the psychologist conceded that Turner clearly understood that the killing of Renee Howard was wrong.
 

 The jury recommended a death sentence by a vote of ten to two. At the
 
 Spencer
 

 [1]
 

 hearing, Turner presented two witnesses. A mitigation specialist and a psychotherapist testified that Turner had a history of abandonment by his mother, became substance dependent at a very young age and therefore never had proper cognitive development, and had a low intelligence level. A psychologist expressed the opinion that Turner had frontal lobe impairment, experienced difficulty with performance tests used to measure executive functions, and had an IQ of around 79. The State presented three additional victim impact statements, from Howard’s granddaughter, aunt, and uncle.
 

 On April 24, 2008, the trial judge sentenced Turner to death for the murder of
 
 *220
 
 Renee Howard. In pronouncing Turner’s sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of five statutory aggra-vators: (1) the crime was committed while he had previously been convicted of a felony and was under sentence of imprisonment (moderate weight); (2) the defendant had been previously or contemporaneously convicted of a felony involving the use or threat of violence to Stacia Raybon and a law enforcement officer (great weight); (3) the crime was committed while the defendant was engaged in the commission of, or an attempt to commit, the crime of burglary or robbery or both (great weight) (this aggravating factor was merged with another factor: that the crime was committed for financial gain.); (4) the crime was especially heinous, atrocious, or cruel (HAC) (great weight); and (5) the crime was committed in a cold, calculated, and premeditated manner and without any pretense of moral or legal justification (CCP) (significant weight).
 

 The trial court found two statutory mitigating circumstances: (1) the crime was committed while under the influence of extreme mental or emotional disturbance (moderate weight); and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight).
 

 The court also found nine nonstatutory mitigating circumstances: (1) Turner’s ability to form loving relationships (some weight); (2) Turner’s family problems and mental suffering (little weight); (3) Turner’s uncles gave him drugs when he was young (some weight); (4) Turner’s cognitive development was impaired due to substance abuse (some weight); (5) Turner’s chronic alcohol and drug problem (moderate weight); (6) at the time of the murder, Turner was under the influence of crack cocaine (some weight); (7) Turner was a hard worker and skilled carpenter (little weight); (8) prior to escaping, Turner was a good worker in South Carolina (slight weight); and (9) Turner’s appropriate courtroom behavior (some weight).
 

 ANALYSIS
 

 Double Jeopardy
 

 “The Fifth Amendment to the United States Constitution and article I, section 9 of the Florida Constitution protects an accused against being twice put in jeopardy for the same offense.”
 
 State v. Gaines,
 
 770 So.2d 1221, 1225 (Fla.2000) (citing
 
 Thomason v. State,
 
 620 So.2d 1234, 1236 (Fla.1993)). In
 
 United States v. Dinitz,
 
 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the Unites States Supreme Court explained the importance of the Double Jeopardy Clause:
 

 The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense.
 
 See United States v. Wilson,
 
 420 U.S. 332, 343 [95 S.Ct. 1013, 43 L.Ed.2d 232] [(1975)];
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 717 [89 S.Ct. 2072, 23 L.Ed.2d 656] [(1969)]. Underlying this constitutional safeguard is the belief that “the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live
 
 in
 
 a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.”
 
 Green v. United States,
 
 355 U.S. 184, 187-188 [78 S.Ct. 221, 2 L.Ed.2d 199] [(1957)].
 

 Id.
 
 at 606, 96 S.Ct. 1075.
 

 Jeopardy attaches when the jury is impaneled and sworn.
 
 See Gaines,
 
 770
 
 *221
 
 So.2d at 1225. However, not every mistrial declared after jeopardy attaches invokes the protections of the Double Jeopardy Clause. If a mistrial is the product of “manifest necessity” or is declared at the voluntary request of a defendant, a retrial will not violate the Double Jeopardy Clause.
 
 See Oregon v. Kennedy,
 
 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).
 

 In
 
 Rutherford v. State,
 
 545 So.2d 853 (Fla.1989), this Court stated:
 

 The general rule is that when a mistrial is declared upon the defendant’s motion or with his consent or because of a manifest, urgent, or absolute necessity, jeopardy does not attach and the defendant may be retried.
 
 McLendon v. State,
 
 74 So.2d 656 (Fla.1954);
 
 State ex rel. Larkins v. Lewis,
 
 54 So.2d 199 (Fla.1951). An exception occurs when the prosecution goads the defense into moving for a mistrial and gains an advantage from the retrial.
 
 Oregon v. Kennedy,
 
 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).
 

 Id.
 
 at 855.
 

 In
 
 Rutherford,
 
 a mistrial was ordered after the prosecution committed a willful discovery violation.
 
 See id.
 
 In the subsequent retrial, the defendant was convicted and sentenced to death.
 
 See id.
 
 On appeal, Rutherford claimed the second trial violated his constitutional rights by placing him in double jeopardy.
 
 See id.
 
 In rejecting this argument, this Court stated:
 

 While the prosecutor misapprehended his objection, there is no indication that his motive was to obtain a mistrial. The objective of seeking to cause the other party to move for a mistrial is to “save” a losing case. Our review of the record in the first case convinces us the prosecutor’s motive was to introduce evidence that tended to convict Rutherford, not to create error that would force a new trial. As there was no goading the defense into moving for a mistrial, the
 
 Oregon v. Kennedy
 
 exception does not apply and it was not error to try Rutherford a second time.
 

 Id.
 

 Here, there is no indication that the prosecution “goaded” Turner into asking the trial court for a mistrial. To support his argument, Turner claims that the trial court erred in denying his request to excuse juror Gard after it was discovered that juror Gard suffered from a seizure condition. Even if true, judicial error is not a recognized exception to the general rule that “when a mistrial is declared upon the defendant’s motion or with his consent or because of a manifest, urgent, or absolute necessity, jeopardy does not attach and the defendant may be retried.”
 
 Id.
 
 Accordingly, we hold that because Turner, after considerable discussion with his counsel, chose to ask for a mistrial and there was no “goading” by the prosecution, the State was not barred from proceeding to this subsequent trial.
 

 Turner next argues that “the mistrial was not with his consent, because the trial court made it clear that based upon this Court’s ruling in Williams
 
 [2]
 
 that unless [Turner] allowed an alternate juror to be seated the trial court would declare a mistrial sua sponte.” Turner’s argument, however, provides no basis for relief.
 

 Even if Turner had not moved for a mistrial, there was a “manifest necessity” for a new trial. When the court grants a mistrial sua sponte or at the prosecution’s behest over a defendant’s objection, a “manifest necessity” standard is applied.
 
 See Kennedy,
 
 456 U.S. at 672,
 
 *222
 
 102 S.Ct. 2083. The judge may discharge the jury when “taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.”
 
 United States v. Perez,
 
 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824). This Court has illustrated several instances in which manifest necessity may exist:
 

 (a) the
 
 illness of the judge, the accused, or a juror requiring the absence of any of them from the court,
 
 or (b) the inability of the jury to agree on a verdict after due and proper deliberation, or (c) a consent of the accused himself.
 

 State ex. rel. Williams v. Grayson,
 
 90 So.2d 710, 713 (Fla.1956) (emphasis supplied). Here, juror Gard suffered a seizure during deliberations, an event that would certainly qualify as an “illness of a juror,” as described in
 
 Grayson.
 

 Finally, Turner claims that the trial court failed to consider less drastic alternatives to a mistrial or give any consideration to the appellant’s double jeopardy right. In
 
 Thomason v. State,
 
 620 So.2d 1234, 1239 (Fla.1993), this Court stated, “The double jeopardy provision of the Florida Constitution requires a trial judge to consider and reject all possible alternatives before declaring a mistrial over the objection of the defendant....” The Court further stated, “By failing to consider and reject all possible alternatives to a mistrial, including a continuance,
 
 the trial judge did not meet the requirement of manifest necessity
 
 and double jeopardy barred retrial.”
 
 Id.
 
 at 1240 (emphasis supplied). This argument must fail for two reasons. First, the mistrial was not declared “over the objection of the defendant.” The trial court did not need to consider possible alternatives because the defendant moved for the mistrial. Second, as discussed above, an illness of a juror qualifies as a manifest necessity. This Court has held that “if the trial court ... properly de-clarets] a mistrial based upon sufficient record evidence ... then double jeopardy does not attach.”
 
 Lebron v. Florida,
 
 799 So.2d 997, 1011 (Fla.2001).
 

 Accordingly, we hold that the second trial was not barred on double jeopardy grounds.
 

 Cold, Calculated Premeditation
 

 This Court has articulated the standard for evaluating a trial court’s finding of an aggravating circumstance as follows:
 

 “[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt-that is the trial court’s job. Rather, [this Court’s] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.”
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997) (footnote omitted);
 
 see also Occhicone v. State,
 
 570 So.2d 902, 905 (Fla.1990) (“When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court....”);
 
 Brown v. Wainwright,
 
 392 So.2d 1327, 1331 (Fla.1981) (“Our sole concern on evidentiary matters is to determine whether there was sufficient competent evidence in the record from which the judge and jury could properly find the presence of appropriate aggravating or mitigating circumstances.”).
 

 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007).
 

 In
 
 Jackson v. State,
 
 648 So.2d 85, 89 (Fla.1994), this Court established a four-part test to determine whether the CCP aggravating factor is justified:
 

 
 *223
 
 (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
 

 Lynch v. State,
 
 841 So.2d 362, 371 (Fla.2003) (citing
 
 Jackson,
 
 648 So.2d at 89). Here, Turner challenges the “cold” and “premeditated” elements.
 

 The Killing Was “Cold”
 

 First, Turner challenges the finding of the trial court that the killing was the product of cool and calm reflection and not prompted by emotional frenzy, panic, or a fit of rage. The trial court found:
 

 The evidence presented at trial establishes that the defendant spent at least a day lurking around the Comfort Inn hotel. He knew where the truck — the victim’s truck was parked and in which room she was staying. The defendant did not enter the victim’s room until her teenage son and daughter were gone. The evidence suggests the defendant, who had seen the victim loading her truck, waited for the opportune moment when the victim and Ms. Raybon were alone with small children to initiate the attack. The evidence indicates the defendant chose his victims carefully as he watched them go back and forth from the hotel room to the truck. He entered the room, knife drawn, prepared to kill. And, as a further indication that the defendant’s acts were the product of cool and calm reflection, after committing the murder, the defendant took the victim’s keys and immediately left in her truck. Stacia Raybon did not give the defendant the keys, nor did she tell him where the victim’s truck was parked. Furthermore, no one testified that the defendant was frantically searching the parking lot for the car that matched the keys in his hand. To the contrary, the evidence suggests the defendant went right to the very vehicle he had previously planned to take.
 

 Turner challenges this finding by claiming that it is inconsistent with the trial court’s finding of two statutory mitigating factors: (1) he was under the influence of extreme mental or emotional disturbance; and (2) his capacity to appreciate criminality or conform his conduct was substantially impaired. Specifically, Turner relies on this Court’s previous decisions in
 
 Santos v. State,
 
 591 So.2d 160 (Fla.1991), and
 
 White v. State,
 
 616 So.2d 21 (Fla.1993).
 

 Turner’s reliance on
 
 Santos
 
 is misplaced. In
 
 Santos,
 
 the defendant murdered his former girlfriend and their infant daughter after numerous domestic disturbances between the parents.
 
 See
 
 591 So.2d at 160. This Court held that the fact that the killing arose from a domestic dispute tended to negate cold, calculated premeditation.
 
 Id.
 
 at 162. Here, Turner essentially claims that the news of his wife’s infidelity initiated a chain of events, including his cocaine use, which ultimately resulted in his murderous conduct. Even if he was emotionally disturbed, Turner provides no logical basis to support a finding that the murder of Renee Howard “arose from a domestic disturbance.” Unlike in
 
 Santos,
 
 Turner did not murder his wife or the man he thought she was cheating with; he murdered a woman with whom he had absolutely no connection prior to this violent encounter.
 
 Santos
 
 cannot be read so broadly as to shield any defendant who is emotionally distraught due to a domestic conflict, regardless of whom that defendant murders.
 

 
 *224
 
 Further, this
 
 Santos
 
 interpretation is undermined by
 
 Lynch v. State,
 
 841 So.2d 362 (Fla.2003). Twelve years after the
 
 Santos
 
 decision, this Court made it clear in
 
 Lynch
 
 that it “does not recognize a domestic dispute exception in connection with death penalty analysis.”
 
 Id.
 
 at 377. Therefore, even if Howard’s murder did, in fact, “arise from a domestic disturbance,” such a defense would not preclude a finding of CCP.
 

 Turner’s reliance on
 
 White
 
 is also misguided. Turner relies on
 
 White
 
 to support his contention that CCP cannot be established beyond a reasonable doubt because his behavior was affected by cocaine. In
 
 White,
 
 the trial court found: “The capital crime for which the Defendant is to be sentenced was committed while he was high on cocaine and while he (questionably) was under the influence of extreme mental or emotional disturbance.”
 
 White,
 
 616 So.2d at 24. Based on the trial court’s specific finding in
 
 White,
 
 this Court held that “the evidence of White’s excessive drug use
 
 and the trial judge’s express finding that White committed this offense ‘while he was high on cocaine
 
 ’ ” precluded application of the CCP aggravating factor.
 
 Id.
 
 at 26 (emphasis supplied). A critical distinction between
 
 White
 
 and the facts of the present case is that here, the trial court did
 
 not
 
 make an express finding that Turner committed the murder while he was high on cocaine. Here the trial judge recognized that the defendant began using crack cocaine at some point after September 22, 2005, which is not in dispute. However, whether the abuse of cocaine was chronic and truly mitigating in this case is another issue. The trial court carefully analyzed the testimony of numerous experts with regard to the effects of Turner’s cocaine use and did not reach the conclusion that he was high on cocaine at the time he murdered Howard.
 

 Even if the trial court had found that Turner was addicted to crack cocaine, such a finding would not necessarily preclude the CCP aggravator
 
 from
 
 being found. This Court has explained that a chronic drug abuser can still act in accordance with a deliberate plan where the evidence indicates that the person “was fully cognizant of his actions on the night of the murder.”
 
 Guardado v. State,
 
 965 So.2d 108, 117 (Fla.2007) (quoting
 
 Robinson v. State,
 
 761 So.2d 269, 278 (Fla.1999)).
 

 Here, Turner was fully cognizant of his actions the morning of the murder. Prior to entering the hotel room, Turner exchanged pleasantries with a housekeeper and asked for a towel. After attacking Howard and Rabón, Turner was able to locate the keys to the victim’s truck, proceed directly to the truck, and drive away. Later, after initially pulling over to the side of the road, Turner made the conscious decision to ram the police vehicle and attempt to elude capture. All of these actions are consistent with someone who was fully cognizant of his actions.
 

 Neither of the cases upon which Turner relies negates the trial court’s finding that the killing was the product of cool and calm reflection and not prompted by emotional frenzy, panic, or a fit of rage. To the contrary, the trial court’s finding is supported by competent, substantial evidence. We therefore hold that the “cold” factor of the CCP aggravating circumstance was properly found by the trial court.
 

 Turner Exhibited Heightened Premeditation
 

 Turner next challenges the finding of the trial court that he had exhibited heightened premeditation. The trial court found:
 

 The State has proven beyond a reasonable doubt that the defendant exhib
 
 *225
 
 ited heightened premeditation. Heightened premeditation is demonstrated by a substantial period of reflection. The defendant was at or around the Comfort Inn hotel for hours, if not days, before he committed this murder. He planned to steal the victim’s truck sometime before the crime was committed, and waited for the opportune moment before carrying out his plan. When he entered the victim’s room, he did so, knife in hand, ready to attack. In total, he stabbed Renee Boling Howard 15 separate times in two separate attacks.
 

 After the defendant’s initial attack on the victim, he turned his attention to Stacia Raybon. The defendant grabbed Stacia Raybon and stabbed her twice. When he realized Ms. Howard was still alive and headed for the door, he abandoned his attack on Ms. Raybon, who was at the rear of the hotel room, and turned his sights once again on Ms. Howard. He did not stop the attack on Ms. Howard until he had finished the job he had begun when he initially entered the room. When Ms. Howard was dead and Stacia Raybon was locked in the bathroom, the defendant left with what he had come for, the keys to the victim’s truck. These facts show a substantial period of reflection and thought by the defendant.
 

 Turner challenges this finding by claiming that the State has failed to establish that he entered the hotel room with the specific intent to kill. He claims that it is equally plausible that he entered the hotel room with the intent to commit a robbery. To support his proposition, he relies on
 
 Geralds v. State,
 
 601 So.2d 1157 (Fla.1992), in which this Court stated:
 

 To establish the heightened premeditation required for a finding that the murder was committed in a cold, calculated, and premeditated manner, the evidence must show that the defendant had a “careful plan or prearranged design to
 
 kill.” Rogers v. State,
 
 511 So.2d 526, 533 (Fla.1987) (emphasis supplied). A plan to kill cannot be inferred solely from a plan to commit, or the commission of, another felony.
 
 Jackson v. State,
 
 498 So.2d 906, 911 (Fla.1986);
 
 Hardwick v. State,
 
 461 So.2d 79, 81 (Fla.1984). As we said in
 
 Hardwick:
 

 The premeditation of a felony cannot be transferred to a murder which occurs in the course of that felony for purposes of this aggravating factor. What is required is that the murderer fully contemplate effecting the victim’s death. The fact that a robbery may have been planned is irrelevant to this issue. 461 So.2d at 81.
 

 Geralds,
 
 601 So.2d at 1163 (some citations omitted). The only evidence presented by the State to support the contention that Turner had a prearranged intent to kill
 
 before
 
 entering the hotel room, he argues, was the fact that he entered the room with a knife poised to attack. All of the other evidence outlined by the trial court to support heightened premeditation (i.e., Turner lurked outside the hotel room and waited until the two older children left) is consistent with an intent to rob, but not necessarily to kill.
 

 Geralds,
 
 however, does not provide a complete description of this Court’s “heightened premeditation” analysis. In
 
 Hudson v. State,
 
 992 So.2d 96 (Fla.2008), this Court stated:
 

 Heightened premeditation necessary for CCP is established where, as here, the defendant had ample opportunity to release the victim but instead, after substantial reflection, “acted out the plan [he] had conceived during the extended period in which [the] events occurred.”
 
 Alston v. State,
 
 723 So.2d 148, 162 (Fla.
 
 *226
 
 1998) (quoting
 
 Jackson v. State,
 
 704 So.2d 500, 505 (Fla.1997)).
 

 Id.
 
 at 116.
 

 We hold that competent and substantial evidence exists to support the trial court’s finding of heightened premeditation. Turner entered the room with a weapon drawn poised to attack. He did not ask the victims to hand over their money or the keys to the truck, or make any other demands upon entering the room. Instead, Turner burst into the hotel room and began stabbing the two women. Of greatest importance, after initially stabbing the women, he could have left, but chose not to. We have held that CCP exists where, as here, a defendant has ample opportunity to leave, but instead decides to murder the victim.
 
 See, e.g., Wright v. State,
 
 19 So.3d 277 (Fla.2009);
 
 Ibar v. State,
 
 938 So.2d 451, 474 (Fla.2006);
 
 Nelson v. State,
 
 850 So.2d 514, 527 (Fla.2003);
 
 Hertz v. State,
 
 803 So.2d 629, 651 (Fla.2001).
 

 Even if we were to find the trial court’s finding of CCP was made in error, such an error would be harmless. When this Court strikes an aggravating factor on appeal, “the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.”
 
 Jennings v. State,
 
 782 So.2d 853, 863 n. 9 (Fla.2001);
 
 see also Douglas v. State,
 
 878 So.2d 1246, 1268 (Fla.2004) (“Striking [an] aggravator necessitates a harmless error analysis.”). The trial court found five aggravating factors: (1) the crime was committed while the defendant had previously been convicted of a felony and was under sentence of imprisonment; (2) the defendant had been previously or contemporaneously convicted of a felony involving the use or threat of violence to Stacia Raybon and a law enforcement officer; (3) the crime was committed while the defendant was engaged in the commission of, or an attempt to commit, the crime of burglary or robbery or both (merged with the financial gain aggravating circumstance); (4) HAC; and (5) CCP. In the sentencing order, the trial court explicitly stated, “Even in the absence of the cold, calculated, and premeditated aggravating circumstance, this Court finds that the remaining aggravating circumstances would far outweigh the mitigating circumstances.” The trial court specifically discussed the potential absence of CCP, but chose not to discuss a hypothetical absence for any of the other aggravating circumstances. In light of the influential weight given to the other four aggravating circumstances and the trial court’s own statement in the sentencing order, there is no reasonable possibility that the finding of the CCP aggravating circumstance affected the sentence that was imposed in this case. Accordingly, even if we were to strike the CCP aggra-vator, Turner would not be entitled to a new penalty phase.
 

 Proportionality
 

 Turner next alleges that his death sentence is disproportionate. In reviewing for proportionality, the totality of the circumstances should be considered and the matter should be compared with other capital cases.
 
 See Nelson v. State,
 
 748 So.2d 237, 246 (Fla.1999). This comparison, however, is not between the number of aggravating and mitigating circumstances.
 
 See Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996) (citing
 
 Kramer v. State,
 
 619 So.2d 274, 278 (Fla.1993)).
 

 In the instant matter, the jury recommended the death penalty by a vote of ten
 
 *227
 
 to two. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances against the statutory and nonstatutory mitigating circumstances. In imposing the death sentence, the trial court found five aggravating factors: (1) the crime was committed while the defendant had previously been convicted of a felony and was under sentence of imprisonment; (2) the defendant was previously or contemporaneously convicted of a felony involving the use or threat of violence to Stacia Raybon and a law enforcement officer; (3) the crime was committed while the defendant was engaged in the commission of or an attempt to commit the crime of burglary or robbery or both (merged with the financial gain aggravating circumstance); (4) HAC; and (5) CCP. The trial court found two statutory mitigating circumstances: (1) the crime was committed while under the influence of extreme mental or emotional disturbance (moderate weight); and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight). The court also found nine non-statutory mitigating circumstances: (1) Turner’s ability to form loving relationships (some weight); (2) Turner’s family problems and mental suffering (little weight); (3) Turner’s uncles gave him drugs when he was young (some weight); (4) Turner’s cognitive development was impaired due to substance abuse (some weight); (5) Turner’s chronic alcohol and drug problem (moderate weight); (6) at the time of the murder, Turner was under the influence of crack cocaine (some weight); (7) Turner was a hard worker and skilled carpenter (little weight); (8) prior to escaping, Turner was a good worker in South Carolina (slight weight); and (9) Turner’s appropriate courtroom behavior (some weight). After reviewing the totality of the circumstances, we hold that the instant matter is comparable to other capital cases in which this Court has upheld the death penalty.
 

 This Court has upheld the death penalty even in the absence of the CCP statutory aggravating circumstance. In
 
 Pooler v. State,
 
 704 So.2d 1375 (Fla.1997), the trial court found the following statutory aggravating circumstances: (1) prior violent felony conviction (a contemporaneous attempted first-degree murder); (2) crime was committed during a burglary; and (3) HAC.
 
 See id.
 
 at 1377. The trial court found one statutory mitigating circumstance that the crime was committed while under the influence of extreme mental or emotional disturbance, and the following nonstatutory mitigating circumstances: “[t]he defendant’s honorable service in the military and good employment record, as well as the fact that he was a good parent, had done specific good deeds, possessed certain good characteristics, and could be sentenced to life without parole or consecutive life sentences.”
 
 Id.
 
 After reviewing the trial court’s sentence of death, this Court stated:
 

 We have never approved a per se “domestic dispute” exception to the imposition of the death penalty. As we explained in
 
 Spencer v. State,
 
 691 So.2d 1062 (Fla.1997), there have been cases involving domestic disputes in which we struck the cold, calculated, and premeditated (CCP) aggravator on the basis that the heated passions involved negated the “cold” element of CCP. However, our reason for reversing the death penalty in those cases was that the striking of that aggravator rendered the death sentence disproportionate in light of the overall circumstances.
 
 E.g., White v. State,
 
 616 So.2d 21 (Fla.1993);
 
 Santos v. State,
 
 591 So.2d 160 (Fla.1991);
 
 Douglas v. State,
 
 575 So.2d 165 (Fla.1991);
 
 Fari-
 
 
 *228
 

 nas v. State,
 
 569 So.2d 425 (Fla.1990);
 
 see also Wright v. State,
 
 688 So.2d 298 (Fla.1996) (finding death sentence disproportionate where aggravating circumstances of prior violent felony and commission during a burglary were all related to defendant’s ongoing struggle with the victim and evidence in mitigation was copious);
 
 Nibert v. State,
 
 574 So.2d 1059 (Fla.1990) (death sentence vacated as disproportionate in light of all the mitigating evidence that should have been found where sole aggravating circumstance was HAC). Indeed, we have upheld the death penalty as proportionate in a number of cases where the victim had a domestic relationship with the defendant.
 
 See Spencer [v. State,
 
 645 So.2d 377, 384 (Fla.1994)];
 
 Cummings-El v. State,
 
 684 So.2d 729 (Fla.1996);
 
 Henry v. State,
 
 649 So.2d 1366 (Fla.1994);
 
 Porter v. State,
 
 564 So.2d 1060 (Fla.1990). In
 
 Spencer,
 
 we affirmed the defendant’s death sentence for the murder of his wife where the trial court found the aggravating circumstances of prior violent felony conviction and HAC and a number of mitigating circumstances, both statutory and nonstatutory. In this case, the established mitigation was similar to that in
 
 Spencer
 
 but there was also the additional aggravator that the murder was committed during the commission of a felony.
 
 Thus, under the circumstances of this case and in comparison to other death cases, we cannot say that the death sentence is disproportionate.
 

 Id.
 
 at 1381 (emphasis supplied) (footnote and some citations omitted).
 

 Here, the trial court found the same statutory aggravating circumstances as in
 
 Pooler
 
 plus the CCP and contemporaneous violent felony aggravating circumstances. The only substantial mitigating circumstance present here that is absent in
 
 Pooler
 
 is that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Nonetheless, this Court in
 
 Pooler
 
 upheld a sentence of death even in the absence of the CCP aggravating circumstance.
 
 See id.
 
 Further,
 
 Pooler
 
 negates Turner’s contention that the death sentence is disproportionate when viewed in light of his extreme emotional disturbance arising from his belief that his wife was unfaithful.
 

 Although these cases indicate the sentence here is proportionate, Turner contends that the circumstances in his case are comparable to those in a number of cases involving mental mitigation where this Court vacated the death sentence. All of the cases advanced by Turner, however, involved far fewer aggravators than the instant case.
 
 See Larkins v. State,
 
 739 So.2d 90, 95 (Fla.1999) (“We also note that neither the heinous, atrocious, or cruel nor the cold, calculated, and premeditated ag-gravators are present in this case. These, of course, are two of the most serious aggravators set out in the statutory sentencing scheme, and, while their absence is not controlling, it is also not without some relevance to a proportionality analysis.”);
 
 Hawk v. State,
 
 718 So.2d 159, 163 (Fla.1998) (“In the present case, the two aggravating circumstances (i.e., pecuniary gain, and the contemporaneous attempted murder of Matthew Gray) are arrayed against copious mitigation.”);
 
 Robertson v. State,
 
 699 So.2d 1343, 1345 (Fla.1997) (“The trial court found two aggravating factors: (1) the capital felony was committed during the course of a burglary; and (2) the murder was especially heinous, atrocious, or cruel.”);
 
 Kramer v. State,
 
 619 So.2d 274, 277-78 (Fla.1993) (“In this case, the trial court found two aggravating factors: prior violent felony conviction, and the fact that the murder was heinous, atrocious, or cruel.”);
 
 DeAngelo v. State,
 
 616 So.2d 440, 442
 
 *229
 
 (Fla.1993) (“In sentencing DeAngelo to death, the trial court found only one aggravating factor, that the murder was cold, calculated, and premeditated.”);
 
 Nibert v. State,
 
 574 So.2d 1059, 1061 (Fla.1990) (“The trial court imposed the death sentence upon finding one aggravating circumstance: that the murder was committed in an especially heinous, atrocious, or cruel manner.”);
 
 Fitzpatrick v. State,
 
 527 So.2d 809, 812 (Fla.1988) (“In contrast, the aggravating circumstances of heinous, atrocious and cruel, and cold, calculated and premeditated are conspicuously absent.”).
 

 Accordingly, we hold that the trial court’s imposition of a death sentence for the murder of Renee Howard is proportionate.
 

 Ring v.
 
 Arizona
 
 [3]
 

 Turner correctly acknowledges that this Court has consistently rejected the position that section 921.141, Florida Statutes (2005), is unconstitutional under the Sixth Amendment.
 
 See generally Marshall v. Crosby,
 
 911 So.2d 1129, 1134 n. 5 (Fla.2005) (listing over fifty cases since
 
 Ring’s
 
 release where this Court has rejected similar
 
 Ring
 
 claims). Further,
 
 Ring
 
 does not apply to these facts because the “during-a-felony” and “prior violent felony” aggravating factors are present here.
 
 See, e.g., Walker v. State,
 
 957 So.2d 560, 576 (Fla.2007)
 
 (“Ring
 
 does not apply to the facts of this case because the ‘course of a felony’ aggravator based on Walker’s conviction of kidnapping, resting on a unanimous guilt-phase verdict, is present.”). Turner has not established any basis on which this Court should reconsider the established points of law with regard to Florida’s capital sentencing scheme. Accordingly, we deny relief on this issue.
 

 Sufficiency of the Evidence
 

 This Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed.
 
 See Blake v. State,
 
 972 So.2d 839, 850 (Fla.2007); Fla. R.App. P. 9.142(a)(6). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001) (citing
 
 Banks v. State,
 
 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
 

 The evidence is sufficient to affirm Turner’s convictions for the premeditated murder of Renee Howard. In support of premeditation, the record reflects that Turner was lurking around the hotel for hours before the murder. Further, Turner burst into the room, ready to attack, and then proceeded to stab Howard fifteen times. With regard to placing Turner at the scene, the record reflects that four separate witnesses placed Turner at the hotel prior to the murders. During trial Stacia Raybon provided great detail with regard to Turner’s entry into the hotel room and the stabbing of both women. Moreover, Turner was identified as the driver of the Renee Howard’s stolen truck later that day. Finally, with regard to physical evidence, Turner’s DNA was found in both the hotel room and Howard’s truck. Turner’s bloody shoeprint was also found in the hotel room. The evidence is more than sufficient to affirm the conviction of murder.
 

 CONCLUSION
 

 Based upon the foregoing analysis, we affirm Turner’s convictions and sentences.
 

 It is so ordered.
 

 
 *230
 
 QUINCE, C.J., and LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 PARIENTE, J., concurs as to the conviction and concurs in result only as to the sentence.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 .
 
 Williams v. State,
 
 792 So.2d 1207 (Fla.2001)
 

 [3]
 

 . 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).