617 So.2d 298 (1993)
Charles Sebastian MAULDEN, Appellant,
v.
STATE of Florida, Appellee.
No. 75595.
Supreme Court of Florida.
March 25, 1993.
Rehearing Denied May 10, 1993.
*299 James Marion Moorman, Public Defender and A. Anne Owens, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Krauss, Asst. Atty. Gen., Tampa, and Sara D. Baggett, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Charles Sebastian Maulden appeals his conviction of two counts of first-degree murder and corresponding sentences of death. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
Charles Maulden was married to Tammy Maulden for five to six years. In October 1987, the Mauldens separated. In January 1988, they were divorced and Maulden went to live with his mother in Lakeland, Florida.
For some time after the divorce, Maulden tried but was unable to reconcile the relationship. As time went on, Maulden became more and more depressed. He took Melaril, a prescription drug, to help cope with the depression but discontinued it in 1988. Eventually, Maulden learned that Tammy Maulden and their children were living with another man, Earl Duvall, in Wahneta, Florida, and that Tammy Maulden and Duvall were considering marriage. This added to Maulden's depression.
On Sunday, June 26, 1988, the day before the homicides at issue, the children were visiting Maulden. In the afternoon, Maulden made a telephone call to Duvall's father. During the conversation, Maulden said, "If you love him (Duvall), you'll get him out of there." That evening Maulden saw Tammy Maulden when she picked up the children.
On Monday, June 27, 1988, at approximately 1:30 a.m., Maulden woke up and decided that he was going to kill Tammy Maulden. He drove to the apartment where she and Duvall were staying and saw Duvall's car there. Then, Maulden drove to Saddle Creek Road and dug up a gun he had buried earlier that day. Maulden proceeded back to the apartment, crawled through a bathroom window, entered the room where Tammy Maulden and Duvall were sleeping, and shot them. In all, Maulden fired five shots. Tammy Maulden and Duvall died instantly.
Subsequently, Maulden scraped the signs off the company truck he was using and drove to Las Vegas, Nevada. He was arrested there and was returned to Florida. He was convicted of two counts of first-degree murder, armed burglary, grand theft, and possession of a firearm by a convicted felon. After a penalty proceeding, the jury recommended death by a vote of eight to four. The judge followed the jury's recommendation and sentenced Maulden to death for each count of first-degree murder.
As his first issue on appeal, Maulden, who is white, alleges that the jury selection process was tainted by the prosecution's peremptory challenges of two prospective black jurors. We have reviewed the record, and we cannot say that the trial judge abused his discretion in denying Maulden's objection to these challenges.
As his second and third issues, Maulden argues that the trial judge erred in failing to suppress statements and admissions made by Maulden to the Las Vegas police subsequent to his arrest and in failing to suppress evidence discovered as a result of his arrest. After shooting Tammy Maulden and Duvall, Maulden fled to Las Vegas in a stolen truck. A Las Vegas police officer, making a random computer check of vehicle tags, discovered the truck in the parking lot of the motel where Maulden was staying. The computer indicated that the vehicle was stolen and that the person responsible was wanted for two murders in Polk County, Florida. Upon discovering the truck, the officer notified his dispatcher *300 who, in turn, contacted the Polk County Sheriff and verified that Maulden had arrest warrants outstanding in Florida.
Subsequently, the officer contacted the motel manager to determine who drove the truck to the motel and if that individual was still there. The manager informed the officer that the driver was staying in the motel and provided a key to the room. Two backup officers were summoned, and when they arrived, the police entered the room. The officers used the key to unlock the door but, because the chain lock was engaged, they were forced to break into the room. After entering the room, the officers handcuffed Maulden and read him his Miranda rights.[1] While in the motel room, the officers questioned Maulden about the vehicle and whether he had committed any crimes in Florida. Maulden confessed to killing his ex-wife and her boyfriend. Maulden also acknowledged that the truck belonged to his employer and told the officers where the keys to the truck could be located. The officers then transported Maulden to the police station where, after again being notified of his Miranda rights, Maulden gave another, more detailed, confession. After Maulden was removed to the police department, a police crime scene specialist searched the truck. Inside, she found the murder weapon and other incriminating evidence.
Maulden argues that his arrest in the motel room was illegal under the rationale of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Therefore, the statements made by Maulden to the police in the motel room immediately after the arrest, and the evidence obtained by the police as a result of the arrest, were tainted and should have been suppressed. We disagree.
The Fourth Amendment of the United States Constitution proscribes unreasonable searches and seizures.[2] In Payton, the Court held that the Fourth Amendment prohibits police from making warrantless, nonconsensual entries into suspects' homes to make routine felony arrests absent exigent circumstances. 445 U.S. at 576, 100 S.Ct. at 1374. This prohibition is also applicable to guests in motel rooms. Sheff v. State, 329 So.2d 270, 272 (Fla. 1976).
In the instant case, a valid Florida warrant had been issued for Maulden's arrest and the Las Vegas police confirmed its existence before they moved to arrest Maulden. However, the police did not obtain a Nevada arrest warrant prior to entering Maulden's motel room to arrest him. Thus, the threshold question is whether the Las Vegas police could properly rely on a valid Florida arrest warrant to effect an arrest in Nevada.
The answer to the question lies in the principle underlying arrest warrants. The purpose of the warrant requirement is
to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.
Payton, 445 U.S. at 602-603, 100 S.Ct. at 1388. As Justice Jackson observed in Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948),
[t]he point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime... . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided *301 by a judicial officer, not by a policeman or government enforcement agent.
(Footnotes omitted.) With these principles in mind, it is clear that, in the case at bar, the reliance by the Las Vegas police on a Florida warrant is in keeping with the spirit underlying the Fourth Amendment.
Warrants for Maulden's arrest were obtained in Florida. Thus, there was a determination by a neutral, detached magistrate that probable cause existed to arrest Maulden on two counts of murder and for grand theft of the vehicle. The Las Vegas police confirmed the existence of the warrants and relied on them in arresting Maulden. Neither precedent nor logic would dictate that a second arrest warrant needed to be obtained in Nevada before the arrest. We hold that Maulden's Fourth Amendment rights were not infringed, and the precepts of Payton were satisfied.[3]
Based on our holding, all of Maulden's statements and admissions to the police, and the evidence obtained as a result of the arrest, were admissible. Even if the arrest was tainted, however, the failure of the trial court to grant Maulden's motions to suppress could only be harmless error. In New York v. Harris, 495 U.S. 14, 15, 110 S.Ct. 1640, 1641, 109 L.Ed.2d 13 (1990), the defendant was arrested in his home on probable cause but without a warrant in violation of Payton v. New York. Immediately following the arrest, while still in his home, the defendant admitted his guilt to the police. Id. at 16, 110 S.Ct. at 1642. This statement was tainted and, therefore, inadmissible at trial. After the arrest, the defendant was removed from his home and taken to the police station. While there, the defendant made a second statement to the police admitting his guilt. Id. Regarding the second admission, the Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the state's use of a statement made by the defendant outside of his home, even though this statement is taken after an arrest in the home in violation of Payton." Id. at 21, 110 S.Ct. at 1644. Applying the principle of New York v. Harris to the instant case, it is clear that Maulden's statement given at the police station was admissible.
The evidence found in the truck was also admissible even if Maulden's original arrest was illegal. In Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine. Under this exception, evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means. In adopting the inevitable discovery doctrine, the Court explained, "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." Id. at 446, 104 S.Ct. at 2510.
Here, the Las Vegas police located the truck and confirmed that it was stolen before they began the search for Maulden, and therefore well before they arrested and questioned him. Thus, it is clear that Maulden's arrest had nothing to do with the discovery of the truck. Because the gun and other evidence were on the front seat of the truck, there can be no doubt that the items would have been discovered and properly seized.
As his fourth issue, Maulden argues that the trial judge erred by excluding the expert testimony of a psychiatrist, Dr. Darby, during the guilt phase of the trial. Dr. Darby had seen Maulden on several occasions in 1987, the last of which occurred about six months before the murders were committed. Dr. Darby had diagnosed Maulden as suffering from schizophrenia and was treating him with medication. Dr. Darby also saw Maulden in jail after he was apprehended for the murders and continued his treatment. Defense counsel contended *302 that the testimony was admissible in order to aid the jury in understanding Maulden's behavior both before and after he committed the crimes. He further argued that the testimony would tend to show, not that Maulden could not premeditate the crimes, but that he did not do so. In sustaining the State's objection, the trial judge relied upon Chestnut v. State, 538 So.2d 820 (Fla. 1989), in which this Court held that evidence of diminished mental capacity was inadmissible to negate the specific intent required to convict of first-degree premeditated murder.
While the testimony was clearly inadmissible under Chestnut, it was also properly excluded on the ground of lack of relevance. In his proffer, Dr. Darby merely testified that Maulden's schizophrenia was a chronic condition that would intermittently come and go. He did not say that Maulden suffered from organic brain damage, and he expressed no opinion as to his mental condition at the time of the murders. Therefore, even under the views of the dissenting justices in Chestnut, Dr. Darby's testimony would have been inadmissible. Of course, Dr. Darby was permitted to testify in the penalty phase of the trial.
Turning to the penalty phase, we note that the trial judge found three aggravating circumstances: (1) Maulden had been previously convicted of another capital offense or prior violent felony; (2) the murder was committed while Maulden was engaged in the commission of a burglary; and (3) the crime was cold, calculated, and premeditated.[4] In referring to these aggravating circumstances in his sentencing order, the judge stated:
[A]lthough all three of these factors exist, numbers 1 and 2 ... do not, under the facts of this case, warrant the imposition of the death penalty. However, the facts of this case do show that the third aggravation does justify the imposition of the death penalty.
In mitigation, the judge found that Maulden was under the influence of mental or emotional disturbance when the murders were committed and that Maulden's capacity to appreciate the criminality of his conduct and his ability to control his conduct were substantially impaired.[5] He also found that Maulden had cooperated with the police, had shown remorse, and had received no disciplinary reports during his sixteen months in jail.
Maulden argues that the trial court erred in finding that these murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In Santos v. State, 591 So.2d 160 (Fla. 1991), Santos killed his ex-girlfriend, Irma, and their daughter. Two days before the murder, Santos had gone to Irma's home and threatened to kill her. Later, Santos acquired a gun. Id. at 161. On the day of the murder, Santos traveled by taxi to Irma's parents' home, where she was staying. Santos saw Irma and her child walking down the street and proceeded toward them. When Irma saw Santos coming, she attempted to flee. Santos, however, gave chase, caught her, spun her around, and shot Irma and her daughter, killing them both. Id.
This Court reversed the finding that Santos had acted in a cold, calculated, and premeditated manner. Id. at 162. While we acknowledged that the evidence showed that Santos had acquired a gun in advance and had made death threats, we stated that "the fact that the present killing arose from a domestic dispute tends to negate cold, calculated premeditation." Id.
Similarly, in Douglas v. State, 575 So.2d 165 (Fla. 1991), we rejected a finding of cold, calculated premeditation in a domestic setting. In Douglas, the assailant obtained a rifle, tracked down his ex-girlfriend, torturously abused her by forcing her to have sex with her newlywed husband, and then murdered the husband while the woman watched. Id. at 168. In another context, these facts might have led to a finding of cold, calculated premeditation. In a domestic setting, however, where the circumstances evidenced heated passion and violent emotions arising from hatred and jealousy *303 associated with the relationships between the parties, we could not characterize the murder as cold even though it may have appeared to be calculated. See Santos, 591 So.2d at 160.
Santos and Douglas are clearly applicable here. The murders in the instant case were not the product of a deliberate plan formed through calm and cool reflection. See Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). They were "mad acts prompted by wild emotion." Santos, 591 So.2d at 163.
In the instant case, Maulden's emotional distress grew continuously from the time he and his ex-wife separated. The record reflects that the stress of his separation, Tammy Maulden's involvement with Duvall, and Maulden's perception that Duvall was replacing him as "father figure" to the Maulden children were worsened by Maulden's chronic schizophrenia which was then going untreated. At the time of the murder, Maulden was under extreme emotional stress. A psychiatrist testified that Maulden was overwhelmed by his emotions and unconsciously split off from them into a dissociated, or depersonalized, state. Under these circumstances, we cannot characterize the murders of Tammy Maulden and Duvall as "cold." Therefore, we hold that the trial judge erred in finding that the facts in the instant case support the cold, calculated, and premeditated aggravating factor.
The trial judge determined that Maulden's death sentence is only warranted if it is concluded that the murders were committed in a cold, calculated, and premeditated manner. Because we hold the aggravating circumstances to be inapplicable, the penalty of death cannot stand. Therefore, it is unnecessary for us to address Maulden's other penalty phase issues.
We affirm Maulden's convictions for first-degree murder but vacate the death sentences and remand for imposition of life sentences, without eligibility for parole for twenty-five years, on each of the two first-degree murder convictions. The trial judge has the discretion to impose these sentences consecutively or concurrently. See § 921.16(1), Fla. Stat. (1987). We also affirm his convictions and sentences for armed burglary, grand theft, and possession of a firearm by a convicted felon.
It is so ordered.
OVERTON, McDONALD, SHAW, GRIMES and HARDING, JJ., concur.
BARKETT, C.J., and KOGAN, J., concur in result only as to conviction, and concur with sentence.
NOTES
[1] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The Florida Constitution mandates that we construe state search and seizure law in conformity with "the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const.
[3] Maulden also argues that his arrest violated the extradition laws of Nevada and Florida. Both states have adopted the Uniform Criminal Extradition Act. See Nev.Rev.Stat. §§ 179.177-.235 (1967); §§ 941.01-.42, Fla. Stat. (1989). The record reflects that the police complied with the act and we therefore reject this claim.
[4] See §§ 921.141(5)(b), (d), (i), Fla. Stat. (1987).
[5] See §§ 921.141(6)(b), (f), Fla. Stat. (1987).