# Supreme Court of Florida

_____

No. SC12-2159
_____

**TINA LASONYA BROWN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 15, 2014]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and the sentence imposed by the trial court.

## FACTS AND BACKGROUND

In March 2010, Tina Brown, Brown's sixteen-year-old daughter Britnee Miller, Heather Lee, and Audreanna Zimmerman lived in neighboring trailers in an Escambia County mobile home park. The four women were initially good friends, but their relationships—particularly between Miller, Brown, and Zimmerman—

were volatile and often escalated to violence. Brown had previously accused Zimmerman of slashing her tires. Zimmerman had accused Brown of shattering a window in her car, having her boyfriend arrested, and reporting to the Florida Department of Children and Families that she was providing inadequate care to her children. Lee testified that she had intervened on multiple occasions to stop physical altercations between Miller and Zimmerman. On one occasion, Miller, who had recently discovered that Zimmerman was sexually involved with her boyfriend, attempted to strike Zimmerman. Zimmerman, however, defended herself by attempting to disable Miller with a stun gun. Later that day, Lee informed Brown that Zimmerman had used a stun gun on Brown's daughter, to which Brown responded that she was "going to get" Zimmerman.[1]

Several days later, on March 24, 2010, Brown invited Zimmerman to her home under the guise of rekindling their friendship. Before Zimmerman arrived, Brown, Miller, Lee, and Miller's thirteen-year-old friend, were inside the trailer. Brown and Lee were in the kitchen, where Lee instructed Brown on the proper use of a stun gun. Miller then pulled her friend aside and told her, "we're fixing to kill Audreanna [Zimmerman]." Shortly after 9 p.m., Zimmerman entered the trailer.

---

[1] Lee's testimony regarding Brown's state of mind following the altercation was corroborated during trial by Corey Doyle, an inmate housed with Brown at the Escambia County jail. Doyle testified that Brown told her when she heard Zimmerman had used a stun gun on Miller, Brown informed Miller, "don't worry, I'll take care of it."

Brown waited several minutes and then used the stun gun on Zimmerman multiple times. When Zimmerman lost muscular control and fell to the floor, Brown continued to use the stun gun on Zimmerman, who was screaming and crying for help. Eventually, Brown pulled Zimmerman across the trailer into the bathroom. Zimmerman continued to scream and cry for help, so Miller struck Zimmerman in the face and Lee stuffed a sock into Zimmerman's mouth. Zimmerman was then forcibly escorted outside and forced into the trunk of Brown's vehicle.[2] Brown, Miller, and Lee then entered the vehicle and drove away.

The women drove to a clearing in the woods about a mile and a half from the trailer park. Brown exited the car and pulled Zimmerman out of the trunk. Zimmerman attempted to flee, but stumbled in the darkness and was caught by Brown and Miller. The two women wrestled Zimmerman to the ground and simultaneously attacked her. Brown used the stun gun again on Zimmerman as Miller beat her with a crowbar. Brown and Miller then switched weapons and continued to torture and beat Zimmerman. Miller eventually dropped the stun gun and repeatedly punched Zimmerman. Brown returned to the car, retrieved a can of gasoline from the trunk, and walked back toward the beaten and prone, but still

---

2. During trial, Lee disputed this summation of what occurred in the trailer after Brown began to attack Zimmerman. The veracity of Lee's testimony concerning her involvement in this crime, however, was significantly challenged during trial, particularly because Lee, who claimed that she was a victim and was not involved in Zimmerman's murder, pled guilty to second-degree murder based on her involvement in Zimmerman's death.

conscious, Zimmerman.  Brown poured gasoline on Zimmerman, retrieved a lighter from her pocket, set Zimmerman on fire, and stood nearby to watch the screaming Zimmerman burn.  Lee testified that she was standing beside Miller, who exuberantly jumped up and down and screamed, "Burn, bitch! Burn!"  After a few minutes, the three women returned to the car and drove away.  During the ride home, Miller said, "Mom, you've got to turn around.  I left my shoes and the taser."  Brown, however, refused to return to the location of the event.

Shortly thereafter, Terrance Hendrick was outside his home which was located approximately one third of a mile away from the location of the attack.  Hendrick heard a faint female voice asking for help, but he could not see anyone in the darkness.  Eventually, Hendrick saw Zimmerman walking slowly toward his house.  When Zimmerman reached Hendrick's house, she asked for assistance and sat on the front steps.  As he waited on the porch with Zimmerman, Hendrick noticed that she had suffered a significant head injury, did not appear to be wearing clothes, and had a strong odor of gasoline.  He testified that her skin was black and he could not identify her race.

At 9:24 p.m., an emergency medical technician (EMT) arrived at the scene.  When the EMT approached Zimmerman, he observed her sitting on the porch, rocking back and forth with her arms straight out.  Due to the extensive nature of Zimmerman's burns, the EMT testified that he could not initially identify whether

she was wearing clothing. The EMT noticed that Zimmerman's skin was falling off her body, and he believed that over ninety percent of her body was burned. She had severe head trauma, and her jaw was either broken or severely dislocated. The EMT explained that the extent and severity of the burns prevented him from providing Zimmerman medical assistance. He testified that while he generally placed sterile gauze and oxygen on burns, he did not have enough gauze to cover her entire body. He attempted to stabilize her neck, but her skin was charred to such an extent that he could not touch Zimmerman without her skin rubbing off onto his gloves.

Despite her injuries, Zimmerman was conscious and alert. She identified Brown and Lee as her attackers and told the EMT that she was "drug out of the house, tased, beaten in the head with a crowbar, and then set on fire." She also provided her address as well as the addresses of her attackers, and asked the EMT to protect her children. The ambulance arrived within a few minutes and transported Zimmerman to the hospital. Inside the ambulance, Zimmerman repeatedly asked if she was going to recover. She told the paramedic that Brown, Miller, and Lee poured gasoline on her and set her on fire. She also stated that she "thought they had made up." Zimmerman was stabilized at a local hospital and then transferred to the Burn Center at the University of South Alabama Hospital in Mobile, Alabama, where she died sixteen days later.

When Brown, Miller, and Lee returned to Brown's trailer, Brown and Miller removed their bloodstained clothing and placed it in a garbage bag. Lee removed her shoes, which were also stained with blood, and placed them in the bag. Miller informed her friend, who had remained at the trailer during the attack, that she had injured her hand striking Zimmerman, and that the three women had set Zimmerman on fire. Miller and her friend then used Brown's car to drive to the hospital to get medical care for Miller. Before returning from the hospital early the next morning, Miller discarded the bag of bloodstained clothing in a dumpster and attempted to remove the bloodstains from the inside of Brown's car.

With the information provided by Zimmerman, law enforcement officers apprehended Brown and Lee shortly after the attack and Miller was arrested after she returned from the hospital the next day. The three women were, however, released while Zimmerman was in the hospital. During that time, Brown informed her friend Pamela Valley that she, Miller, and Lee had beaten Zimmerman, forced her into a car, driven her to an open field and "lit her on fire and didn't look back." A few days later, Brown informed Valley that Zimmerman was still alive and requested Valley to finish her off. Valley declined and later reported the conversation to law enforcement. Brown, Miller, and Lee were re-arrested on April 9, 2010, the date of Zimmerman's death.

At the scene of the burning, law enforcement officers discovered several pieces of evidence including a pair of white shoes; a stun gun with blood on the handle; paper stained with blood; an orange, gold, and black hairweave[3]; a crowbar; and a pool of blood. Additional blood was discovered on the passenger seat headrest in Brown's vehicle. During trial, a DNA expert testified that the blood on the headrest matched the known DNA profile of Zimmerman. Another DNA expert testified that the blood on the stun gun matched the known DNA profile of Brown. Finally, the medical examiner testified that the cause of Zimmerman's death was multiple thermal injuries, and the manner of death was homicide.

On June 21, 2012, a jury convicted Brown of the first-degree murder of Audreanna Zimmerman. During the penalty phase, the defense presented the testimony of several family members, including Brown's two sons, her brother, her aunt, and two of her uncles. The defense also presented the testimony of Dr. Elaine Bailey, a psychologist, and introduced several family photos. The State presented one witness, Dr. John Bingham, a licensed mental health counselor, and also entered a photograph of Zimmerman into evidence.

---

3. The officer that interviewed Brown after she was arrested on the night of the attack noticed that Brown was missing a large section of hair from the back of her head that matched the hairweave discovered at the scene.

The testimony presented during the penalty phase established that Brown's parents, Willie Coleman, Sr., and Lily, were teenagers when they married. Brown was born in North Chicago shortly after her parents were married, and her brother, Willie Coleman, Jr., was born eleven months later. Although many family members described Brown's parents as hard workers, they were also described as "partiers" who went to clubs at night and on the weekends where they would consume alcohol and use drugs.[4] This lifestyle prevented Brown's parents from spending a significant amount of time with their children. Often Brown and Willie, Jr., were either left at home alone or taken to the homes of different family members for extended stays. Brown's uncle testified that Willie, Sr., would bring Brown and her brother to his house on Friday nights and would not return until Sunday evening to retrieve them. As a result, Brown was forced into a parenting role for her brother at a very early age. She would prepare meals for Willie, Jr., dress him, assist him with homework, and walk him to and from school. Willie, Jr., testified that he spent ninety percent of his time with his sister, and that his sister and his aunts, uncles, and grandparents raised him.

Shortly before Brown's twelfth birthday, Willie, Sr., beat her mother. In response, Brown's mother moved out, and Brown's parents divorced shortly

_____

4. While the record reflects that Brown's father held steady employment, Brown's family members believed that the primary source of Willie, Sr.'s, income came not from his jobs, but from selling drugs.

thereafter. Brown's mother was later charged with child abandonment, so Willie, Sr., who frequently used and sold drugs from his home, retained custody of Brown and Willie, Jr. After her mother moved out, Brown's father began sexually abusing Brown. Brown's uncle testified that he suspected Brown was being sexually abused by her father because she was visibly uncomfortable around Willie, Sr., and Willie, Sr., interacted with her as if he were her boyfriend and not her father. When Brown attempted to discuss the abuse with her paternal grandmother, the grandmother grew enraged with Brown for accusing her son of sexually abusing his child, kicked Brown out of the house, and told her never to return.

Willie, Sr., stopped sexually abusing Brown when he met his second wife, Melinda. However, the living situation in their household did not improve. In fact, Willie, Jr., testified that after Melinda moved in, the family became "very dysfunctional." Brown's uncles testified that on several occasions they attempted to persuade Willie, Sr., to end his relationship with Melinda because they believed she was sexually promiscuous, physically aggressive, a heavy drinker, and a drug user. Willie, Sr., and Melinda would often lock themselves in the bedroom with drugs and alcohol for hours without leaving. On those nights, Brown and Willie, Jr., would wander the streets in an area known for gangs and violence while Willie, Sr., and Melinda used drugs and alcohol. Willie, Jr., testified that Melinda drank

every day, and when she drank she became verbally abusive. Further, while Melinda and Brown initially enjoyed each other's company, their relationship quickly deteriorated. Melinda introduced Brown to drugs and forced Brown to engage in sexual intercourse with men for money. Willie, Jr., testified that their father would physically abuse them when he was high, and that Brown eventually moved out because of this abuse. In addition, when Brown was between the ages of fourteen and twenty, her father ran a gang-related drug operation out of their house. Brown's uncle testified that Willie, Sr., was the enforcer for the organization. Willie, Sr., was eventually investigated by the FBI, arrested, and served a year in prison for his involvement in the organization.

Brown moved in with her mother for a short period of time, but had trouble adjusting to her mother's rules and a structured living environment. Her mother eventually ordered Brown out of the house. She moved from there to her aunt's house. During this transitional period, Brown attended four different schools in four years. She dropped out of high school for a year, but later returned and received her high school diploma. Eventually, Brown moved into a drug house where she met Greg Miller, who is the father of her three children. During this relationship, both Brown and Miller abused drugs and alcohol, and Brown reported incidents of domestic violence. Brown's first child was born cocaine positive. After her second child was born, Brown quickly became pregnant again. During

the third pregnancy, Brown ended her relationship with Miller and entered a substance abuse treatment facility. Her third child, Britnee Miller, was born while Brown was in that facility. As part of her treatment plan, Brown agreed to allow her mother to adopt her two sons.

After she left the treatment facility, Brown was drug free for four years. She spent that time raising Britnee. She also met another man that she married. However, shortly after they married, Brown's husband was convicted of selling drugs. Brown was then hired as a bartender, which is where she met a third man, who was also a drug dealer. Brown and this boyfriend dated for two years. Although Brown was drug free during the relationship, she reported incidents of domestic violence. When Brown's boyfriend was arrested for selling drugs, Brown fell into financial disarray. As a result, Brown accrued multiple speeding tickets that she was unable to pay, and her driver's license was suspended. She was also criminally charged with writing worthless checks. Brown became an exotic dancer to pay the bills, and relapsed to depend on alcohol and cocaine.

Brown's relapse lasted for approximately nine years. During this time, Brown was broke, homeless, and prostituted herself for money to facilitate her drug addiction. She wrote additional worthless checks and was ordered to participate in a court-ordered treatment program. Brown graduated from the program at age thirty-five, and was hired as an assistant manager at a catering

company. She was promoted to manager, and was stable in this job for approximately four years. She started dating a fourth man. Brown's family members testified that at this time in her life she was doing very well, her relationship with her boyfriend was good, and her two sons visited her often. However, a few months later, Brown discovered that her boyfriend was cheating on her with her brother's girlfriend and terminated the relationship. The emotional trauma Brown suffered as a result of the breakup was substantial. Brown left her job, wrote more worthless checks, and experienced another relapse. This relapse, however, lasted only about a month.

During the summer of 2009, Brown enrolled in online college classes, moved to Pensacola, Florida, and started working at Waffle House. By Thanksgiving, however, Brown was struggling financially, had relapsed again and quit her job. Brown obtained drugs by engaging in sex for drugs with Heather Lee's husband. On the day of the attack, Brown told Dr. Bailey she had used "several hundred dollars" worth of cocaine.[5]

Dr. Bailey testified that she interviewed Brown, Brown's mother, Brown's aunt, Brown's two uncles, Brown's brother, and Brown's two sons. Dr. Bailey also testified that she reviewed Brown's medical, legal, and academic records;

---

5. Brown, however, told Dr. Bingham that she smoked "not as much" cocaine on the day of the attack as she had in the past.

Brown's psychological testing; the offense report; the supplemental investigative report; the autopsy report; and the statements of witnesses and codefendants. Based on her evaluation, Dr. Bailey concluded Brown suffered from repeated traumas, addictions, physically and sexually abusive relationships, negative community influences, and exposures to violence both in her childhood and adult life. Dr. Bailey testified that Brown's parents were neglectful and provided an inadequate and unhealthy foundation, which negatively impacted Brown's development. Dr. Bailey concluded that the repercussions from the repeated traumas in Brown's childhood extended for decades into her adolescence and adulthood. However, Dr. Bailey concluded that Brown was logical, and was able to think linearly and rationally. Nothing in Brown's past demonstrated a propensity for violence, or that she was suffering from bipolar disorder, any mood disorders, or schizophrenia. While Brown did exhibit some psychotic symptoms, Dr. Bailey testified that Brown was not under extreme emotional distress at the time of the murder. Dr. Bailey would not diagnose Brown with any condition other than dependence on crack cocaine, which was in remission due to her incarceration. Finally, Dr. Bailey testified that Brown did not deny her involvement in the murder, and that Brown felt remorseful for her actions.

Dr. Bingham, the State's expert, testified that he conducted a mental status evaluation of Brown and concluded that she did not exhibit signs of psychosis and

possessed an intelligence level in the low-average range.  He further testified that while Brown exhibited anger and rage, there was no indication that those feelings inhibited her ability to think clearly or to recognize right from wrong.  He concluded that Brown's actions on the night of the attack demonstrated preplanning, direction, and were goal oriented.  Dr. Bingham found no evidence that Brown lacked the capacity to conform her conduct to the requirements of the law, or that she exhibited diminished capacity in understanding the criminality of her conduct.  He concluded that she was not under extreme duress or experiencing an emotional disturbance at the time of the offense.  Finally, Dr. Bingham concluded that while there was substantial trauma in Brown's life, there was no cause and effect relationship connecting Brown's past to her actions in murdering Zimmerman.

On June 26, 2012, the jury recommended a death sentence by a unanimous vote.  During the Spencer[6] hearing, the State presented a letter from the mother of the victim.  The defense presented several records from the Illinois Department of Children and Family Services and a letter from one of Brown's friends.  Brown then apologized to the victim's family and stated that Zimmerman "died a horrific death, and I was one of the ones who participated in taking her life.  She didn't deserve it at all."

_____

6.  See Spencer v. State, 615 So. 2d 688 (Fla. 1993).

On September 28, 2012, the trial court sentenced Brown to death for the murder of Audreanna Zimmerman. In pronouncing Brown's sentence, the trial court found that the State had proven beyond a reasonable doubt the existence of three statutory aggravating circumstances: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (3) the murder was committed while Brown was engaged in the commission of a kidnapping (significant weight). See §§ 921.141(5)(d), (h), (i), Fla. Stat. (2010).

The trial court found that one statutory mitigating circumstance, that Brown had no significant history of prior criminal activity, was established and gave it minimal weight.[7] The trial court found twenty-seven nonstatutory mitigating circumstances. Specifically, the court found that Brown: (1) was the child of a teenage mother (minimal weight); (2) was neglected by both parents (some weight); (3) lost her childhood due to parental neglect (some weight); (4) was abandoned by her mother (some weight); (5) had a history of family violence

---

7. The trial court considered but rejected four additional statutory mitigating circumstances: (1) the crime was committed while Brown was experiencing an extreme emotional disturbance; (2) Brown was an accomplice in the crime and her participation was relatively minor; (3) Brown acted under extreme duress; and (4) the capacity of Brown to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was significantly impaired.

(some weight); (6) was exposed to drugs during her adolescence (some weight); (7) suffered developmental damage due to her parents' use of and dependence on drugs (some weight); (8) was subjected to sexual violence inflicted by her father; (some weight); (9) was betrayed by a trusted family member (i.e., her grandmother) (some weight); (10) experienced corruptive community influences and exposure to a criminal lifestyle (some weight); (11) experienced chaotic moves and transitions (little weight); (12) was a victim of domestic violence during her adult life (some weight); (13) witnessed a violent homicide and served as a State witness in a murder trial (little weight); (14) lost her family (her parental rights were terminated for her two sons, and she has no relationship with her mother or father) (little weight); (15) suffered repeated trauma throughout her life (little weight); (16) suffered from drug addiction (little weight); (17) suffered from the long term effects of chronic cocaine use on her brain (some weight); (18) was a productive citizen during periods of sobriety (little weight); (19) was living in poverty at the time of the crime (minimal weight); (20) behaved well in jail (little weight); (21) conducted a bible study program (little weight); (22) exhibited good courtroom behavior (little weight); (23) has no possibility of parole (little weight); (24) showed remorse (some weight); (25) received a different sentence than that of her co-defendants (some weight)[8]; (26) had no history of prior criminal violence

8.  In finding this mitigating circumstance, the trial court noted that:

- 16 -

(moderate weight); and (27) was using cocaine on the day of the crime (moderate weight).

The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and noted that this case, "particularly because of the heinous, atrocious, [or] cruel nature of the murder of Audreanna Zimmerman, falls into the class of murders for which the death penalty is reserved." Accordingly, the court imposed upon Brown the sentence of death. This appeal followed.

## ANALYSIS

### Cold, Calculated, and Premeditated

In reviewing whether a trial court appropriately applied an aggravating circumstance, it is not the role of this Court to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt. Lynch v. State, 841 So. 2d 362, 368 (Fla. 2003). Rather, this Court's responsibility on appeal is to review the record to determine whether the trial court applied the correct rule of law for each aggravating circumstance and, if so,

---

the three people involved in the murder of Zimmerman are not similarly situated. Despite her involvement in Zimmerman's murder, Britnee Miller cannot legally be sentenced to death as she was less than 18 years of age when the murder was committed. Heather Lee was convicted, pursuant to a negotiated plea agreement with the State, of second degree murder. Heather Lee cannot legally be sentenced to death.

(Citation omitted.)

- 17 -

whether competent, substantial evidence supports its finding.  Id.  For a CCP finding to be considered legally sufficient, the evidence must satisfy a four-part test:

> (1) [T]he killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); [] (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); [] (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Id. at 371 (citing Evans v. State, 800 So. 2d 182, 192 (Fla. 2001)).  This aggravating circumstance pertains specifically to the state of mind, intent, and motivation of the defendant, and involves a much higher degree of premeditation than that required to prove first-degree murder.  Wright v. State, 19 So. 3d 277, 298 (Fla. 2009); Deparvine v. State, 995 So. 2d 351, 381-82 (Fla. 2008).  To support a finding of CCP, the evidence must establish beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.  Williams v. State, 37 So. 3d 187, 195 (Fla. 2010).  The aggravating factor can be established by circumstances demonstrating advance procurement of a weapon, lack of resistance or provocation by the victim, and the appearance of a killing carried out as a matter of course.  Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007).

- 18 -

Brown contends that the trial court erred in finding CCP for two reasons. First, while she concedes that the murder was calculated, premeditated, and lacked any pretense of moral or legal justification, Brown contends that the murder was not "cold," but was instead a rage-type killing premised on her intense and irrational desire to seek revenge after Zimmerman attempted to harm her daughter with a stun gun. To support the contention, Brown notes that both Dr. Bingham and the trial court concluded that while there was no evidence that she was experiencing an extreme emotional disturbance at the time of the offense, she did demonstrate extreme anger and rage during the criminal episode. Second, Brown contends that she was high on crack cocaine at the time of the crime, and this drug-induced state prevented her from possessing the cold and calm reflection necessary to support the first element of CCP. For the reasons that follow, we conclude that competent, substantial evidence supports the trial court's application of this aggravating factor.

## Extreme Anger and Rage

The evidence presented during trial established that Brown, her daughter Britnee Miller, and Zimmerman had a mercurial relationship that frequently involved fights and occasionally led to physical violence. Several days before the murder, Miller, apparently upset with Zimmerman for sleeping with her boyfriend, attempted to attack Zimmerman. In response, Zimmerman attempted to harm

Miller with a stun gun.  When Brown was informed by Heather Lee of the details of the altercation, Brown responded that she was "going to get" Zimmerman. Brown later told Corey Doyle, an inmate housed with Brown at the Escambia County jail, that she told her daughter, "don't worry, I'll take care of it."

On the day of the murder, Brown lured Zimmerman into her home under false pretenses with the express intent to kill her.  Miller's friend testified that Miller stated several minutes before Zimmerman entered the trailer that they—Lee, Miller, and Brown—were going to kill her.  Before Zimmerman arrived, Brown asked Lee to show her the proper method of using a stun gun.  When Zimmerman entered the trailer shortly thereafter, Brown proceeded to stun, beat, and kidnap Zimmerman with Miller and Lee's assistance.

The three women then forced Zimmerman into Brown's car, which contained a crowbar and a canister of gasoline, and drove to a secluded location. Miller and Brown then attacked Zimmerman with the stun gun and the crowbar. As Zimmerman was lying on the ground writhing in pain and crying for help, Brown walked back to the car, retrieved the canister of gasoline, poured it on Zimmerman, lit her on fire, and stood nearby to watch Zimmerman burn.  The three women then returned to the car and drove away.  Miller informed Brown that she had left several items at the scene, but Brown refused to deviate from the plan. When the three women returned to Brown's house, they cleaned themselves and

removed their bloodstained clothing.  Brown then left her trailer and hid at Lee's

trailer next door.  Several days later, when Brown discovered that Zimmerman was

still alive, albeit in critical condition in a hospital, she asked a friend to kill her.

While testimony was offered to indicate that Brown was emotionally

charged <u>during</u> this criminal episode, overwhelming evidence presented at trial

demonstrates that Brown: (1) had the opportunity to coldly and calmly reflect <u>over</u>

<u>the course of several days</u> on the manner in which she planned to kill Zimmerman;

(2) discussed with her two codefendants her intent and plan to murder

Zimmerman; (3) was calm, collected, and not emotionally frenzied, panicked, or

experiencing a fit of rage immediately before the murder, but instead asked Lee to

demonstrate the proper use of the stun gun so she could execute her plan to murder

Zimmerman; and (4) had an abundance of time during the crime to reflect on the

gravity and consequences of her actions, but instead decided to adhere to her

carefully devised plan to deceive, attack, kidnap, and kill Zimmerman.

Further, Dr. Bingham found no indication that Brown's anger and rage

inhibited her ability to distinguish right from wrong or from thinking and

processing information rationally and clearly.  He testified that during the entirety

of the criminal episode, Brown exhibited preplanning, direction, and goal-

orientation.  These facts specifically and directly demonstrate that Brown's

decision to murder Zimmerman was the product of cool and calm reflection and

was not an act prompted by emotional frenzy, panic, or a fit of rage. See Lynch, 841 So. 2d at 368. Furthermore, simply because Brown expressed anger or rage by yelling and screaming during the episode does not negate the careful and deliberate nature of this murder.

Finally, Brown's reliance on Santos v. State, 591 So. 2d 160, 163 (Fla. 1991), Maulden v. State, 617 So. 2d 298, 303 (Fla. 1993), and Douglas v. State, 575 So. 2d 165, 167 (Fla. 1991), is misplaced. In all three cases, this Court struck CCP because the murder was "a crime of irrational, heated passion brought on by a domestic dispute." Santos, 591 So. 2d at 163 ("[T]he fact that the present killing arose from a domestic dispute tends to negate cold, calculated premeditation."); Maulden, 617 So. 2d at 303 ("The murders in the instant case were not the product of a deliberate plan formed through calm and cool reflection. They were 'mad acts prompted by wild emotion.' ") (citations omitted) (quoting Santos, 591 So. 2d at 163); Douglas, 575 So. 2d at 167 ("The passion evidenced in this case, the relationship between the parties, and the circumstances leading up to the murder negate the trial court's finding that this murder was committed in a 'cold, calculated, and premeditated manner without any pretense of moral or legal justification.' ") (footnote omitted). Not only is this case factually distinguishable from Santos, Maulden, and Douglas in that it does not involve a domestic dispute or a comparable level of emotional instability on behalf of the defendant, but this

Court has recently held that even if a murder did "arise from a domestic disturbance," that fact alone does not preclude a finding of CCP because this Court does not recognize a domestic dispute exception in connection with death penalty analysis. Turner v. State, 37 So. 3d 212, 224 (Fla. 2010). Thus, in stark contrast to the murders in Santos, Douglas, and Maulden, the murder in this case was, as the facts previously discussed demonstrate, "the product of a deliberate plan formed through calm and cool reflection." Mauldin, 617 So. 2d at 303.

Cocaine Use on the Day of the Murder

The record demonstrates that Brown had significant problems with drug abuse and addiction throughout her life. Brown grew up in a home where drugs were both used and sold. She began using cocaine at a young age, spent the majority of her life surrounded by drugs and alcohol, and constantly struggled with addiction. Around the time of the murder, Brown had relapsed and was abusing drugs that she obtained in exchange for sex with Heather Lee's husband. Despite these difficult circumstances, we conclude that Brown's chronic drug addiction does not preclude a finding of CCP. See Turner, 37 So. 3d at 224. In fact, this Court has explained that a chronic drug abuser can still act in accordance with a deliberate plan where the evidence indicates that the person was fully cognizant of his or her actions at the time of the murder. Guardado v. State, 965 So. 2d 108, 117 (Fla. 2007).

- 23 -

Brown told Dr. Bailey that, at some unknown time on the day of the murder, she smoked "several hundred dollars" worth of crack cocaine. However, she later told Dr. Bingham that she smoked less crack on the day of the murder than she had on previous days. Brown neither quantified how much crack she smoked, nor did she convey to Dr. Bingham or Dr. Bailey what time during that day she smoked. As a result, Dr. Bingham could not determine whether Brown was suffering from cocaine-induced paranoia at the time of the crime. Dr. Bingham, however, explained that the "high" stemming from cocaine use usually lasts less than half an hour and is often less intense with users that have a higher tolerance. Further, Brown told Dr. Bingham that when using cocaine, she would sometimes act comically and attempt to amuse the children in the trailer park. On other occasions, she would become hyper, obsessive, and would occasionally worry about being apprehended by the police for her use of cocaine. There is no evidence in the record that indicates Brown was experiencing any of these cocaine-induced symptoms on the night of the murder. Thus, nothing in the record indicates that Brown, who had been addicted to drugs for approximately half of her life, suddenly experienced a temporary drug-induced paranoia which prevented her from functioning consistently with her prior history of non-violent behavior during drug use.

In addition, Brown's reliance on <u>Penn v. State</u>, 574 So. 2d 1079, 1083 (Fla. 1991), and <u>White v. State</u>, 616 So. 2d 21, 25 (Fla. 1993), is misplaced. In <u>Penn</u>, this Court, relying on the fact that the defendant "consumed six or seven pieces of the drug during the night and had been under the drug's influence up to the time of his arrest," held that the defendant lacked the cold calculation required to support a finding of CCP. 573 So. 2d at 1080, 1083. In <u>White</u>, this Court held that "the evidence of White's excessive drug use and the trial court's express finding that White committed this offense 'while he was high on cocaine' leads us to find that this aggravating factor was not established beyond a reasonable doubt." 616 So. 2d at 25. In other words, this Court struck CCP in both <u>Penn</u> and <u>White</u> because the defendants' drug use <u>shortly before or during the course of the murders</u> prevented them from being fully cognizant of their actions. Here the record reflects that despite her drug use on the day of the attack, Brown was calm, collected, and had the requisite mental acuity to reflect on and execute her elaborate plan to murder Zimmerman. Thus, we conclude that Brown was fully cognizant of her actions before, during, and after the crime, and her drug use did not interfere with her ability to plan and commit this murder.

In sum, we conclude that the trial court's findings in support of the application of CCP were supported by competent, substantial evidence and we affirm the application of this aggravating circumstance.

## Proportionality

This Court comprehensively reviews each death sentence to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the death penalty. See Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003); see also Hilton v. State, 117 So. 3d 742, 755 (Fla.), cert. denied, 134 S. Ct. 686 (2013). The proportionality analysis does not involve a quantitative comparison between the number of aggravating and mitigating circumstances, but rather entails a qualitative review of the totality of the circumstances and the underlying basis supporting the application of each aggravating and mitigating circumstance. Simpson v. State, 3 So. 3d 1135, 1148 (Fla. 2009).

In this case, the jury unanimously recommended a sentence of death, and the trial court found this recommendation to be appropriate after weighing the statutory aggravating circumstances against the statutory and nonstatutory mitigating circumstances. The trial court found three statutory aggravating circumstances had been established beyond a reasonable doubt: (1) CCP (great weight); (2) HAC (great weight); and (3) the murder was committed during the course of a kidnapping (significant weight). This Court has consistently recognized that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme. Bradley v. State, 33 So. 3d 664, 680 (Fla. 2010). As

a result, when these two aggravators are present, the mitigating circumstances must be of considerable weight to overcome them. Abdool v. State, 53 So. 3d 208, 224 (Fla. 2010).

The mitigation in this case, however, pales in comparison to the weighty aggravation. The trial court found one statutory mitigating circumstance, that Brown had no significant history of prior criminal activity, but only gave it minimal weight. Further, while the trial court found twenty-seven nonstatutory mitigating circumstances, only two of those, that Brown had a history of nonviolence and that she was using cocaine on the day of the murder, were given greater than "some" weight. Brown indisputably had a difficult life and tried at times to overcome her circumstances. However, as Dr. Bingham noted, none of the mitigation presented provided an explanation for why Brown, who for nearly forty years had exhibited no signs of violent behavior, orchestrated this sadistic and pitiless crime.

Based on the totality of the circumstances and our prior precedent, we conclude that a sentence of death is proportionate. See, e.g., Abdool, 53 So. 3d at 215, 224-25 (upholding death sentence as proportionate where the nineteen-year-old defendant set the victim on fire; the trial court found two statutory aggravating circumstances, HAC and CCP, four statutory mitigating circumstances, and forty-eight nonstatutory mitigating circumstances, affording each of the latter moderate

to very little weight); Baker v. State, 71 So. 3d 802, 813, 822 (Fla. 2011) (upholding death sentence as proportionate where the trial court found three aggravating circumstances—HAC, CCP, and during the course of a home invasion, robbery, and kidnapping—one statutory mitigating circumstance, and five non-statutory mitigating circumstances each of which were given "some" to "little" weight), cert. denied, 132 S. Ct. 1639 (2012).

Finally, Brown relies upon Bell v. State, 841 So. 2d 329 (Fla. 2002), to contend that her death sentence is disproportionate. In Bell, this Court vacated the death sentence of the seventeen-year-old defendant who murdered a thirty-one-year-old man who had made sexual advances towards the defendant's girlfriend. 841 So. 2d 331.[9] In addition to the existing substantial mitigation, this Court vacated the sentence primarily because the Court concluded that: (1) the statutory mitigating circumstance that Bell was seventeen years of age was "an extremely significant factor[;]" and (2) Bell's co-defendant, who was "equally culpable for the murder itself," received a life sentence. Id. at 338-39.

None of the reasons that supported vacating the sentence in Bell are present here. First, unlike the defendant in Bell, Brown was not a "teenager[] attempting

_____

9. After the defendant in Bell was sentenced, the United States Supreme Court held in Roper v. Simmons, 543 U.S. 551, 578-79 (2005), that the United States Constitution prohibits the execution of individuals who were under eighteen at the time of their crimes.

to confront a decidedly adult situation." Id. at 338. Brown was forty years old at the time she murdered Zimmerman. Second, in cases where more than one defendant was involved in the commission of the crime, this Court analyzes the relative culpability of each codefendant. Shere v. Moore, 830 So. 2d 56, 60 (Fla. 2002). Here, however, neither Miller nor Lee received the death penalty because they were not eligible for that sentence. Miller, who was a minor at the time of the offense, was constitutionally prohibited from receiving the death penalty pursuant to Roper v. Simmons, 543 U.S. 551 (2005). Lee was also ineligible for the death penalty because she pled guilty to second-degree murder. Thus, by virtue of her plea and second-degree murder conviction, the relative culpability of Lee for the murder of Zimmerman has already been determined to be less than that of Brown. Shere, 830 So. 2d at 61 ("In order to have that same degree of blame or fault the codefendants must, at a minimum, be convicted of the same degree of the crime."). However, even if Lee had not pled guilty to second-degree murder, the evidence presented during trial demonstrates that Brown was the ringleader of this criminal episode, and that Lee, the only other adult eligible for the death penalty, did not share equal culpability with Brown in the murder of Zimmerman. Thus, while Miller and Lee received different sentences from Brown, those lesser sentences do not mean that Brown's sentence of death is disproportionate. See id. at 62-63 (Fla. 2002) (noting that this Court has, in numerous cases, considered and rejected the

- 29 -

argument that a sentence of death was disproportionate when the codefendant receives a lesser sentence based upon a conviction for second-degree murder).

In this case, Brown executed a deliberate and sadistic plan to torture and murder Audreanna Zimmerman. Brown, who was angry with Zimmerman for attempting to harm her daughter with a stun gun several days earlier, lured Zimmerman to her home under false pretenses. Zimmerman, believing that Brown wanted to rekindle their friendship, entered Brown's home only to be stunned, beaten, kidnapped, and transported to a secluded location in the woods. Zimmerman tried to escape, but was caught and again stunned and bludgeoned with a crowbar by Brown and Miller. Brown then set Zimmerman, who was still conscious, crying, and screaming for help, on fire and watched her burn. Several minutes later, Zimmerman, with ninety percent of her body burned, and skin falling off her body, managed to stand up and walk a third of a mile to seek assistance. Brown herself, during the Spencer hearing, acknowledged that Zimmerman died a "horrific" death. Accordingly, we conclude that Brown's sentence is proportionate.

### Sufficiency of the Evidence

While Brown does not contest her guilt, this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So. 2d 839,

850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5).  In assessing sufficiency, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.  Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001).

The record provides more than sufficient evidence to support Brown's conviction for the first-degree murder of Audreanna Zimmerman.  Brown lured Zimmerman into her home under false pretenses, and, with the assistance of Miller and Lee, stunned, beat, kidnapped, and transported Zimmerman to a clearing in the woods near Brown's home where Brown and Miller continued to beat and stun Zimmerman until Brown eventually returned to her car, retrieved a canister of gasoline, poured it on Zimmerman, and set her on fire.  Zimmerman then stood up, walked a third of mile to a local residence where she identified Brown, Miller, and Lee as her attackers.  Brown confessed her involvement in the murder to multiple witnesses who testified during trial, and Brown herself, during the Spencer hearing, confessed that she participated in Zimmerman's murder.  Thus, we conclude that there was sufficient evidence to support Brown's conviction.

**Ring**

Finally, Brown contends that Florida's death penalty statute violates Ring v. Arizona, 536 U.S. 584 (2002).  We deny relief on this claim for two reasons.  First, this Court has repeatedly held that Florida's capital sentencing scheme does not

violate the United States Constitution under Ring. See, e.g., Abdool, 53 So. 3d at 228 ("This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), and King v. Moore, 831 So. 2d 143 (Fla. 2002)."). In addition, this Court has previously held that Ring is not applicable in circumstances where the jury unanimously recommends a sentence of death. See Monlyn v. State, 894 So. 2d 832, 839 (Fla. 2004) ("[B]ecause the jury in Monlyn's case returned a unanimous recommendation of death, he lacks standing to assert any error regarding lack of jury unanimity."); see also Windom v. State, 886 So. 2d 915, 930 (Fla. 2004) (denying the defendant's Ring claim in part because the jury recommended a sentence of death by a unanimous vote). Therefore, Ring does not apply, and we deny relief on this claim.

## Conclusion

Based on the foregoing, we affirm Brown's conviction and sentence of death.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Escambia County,
    Gary Lee Bergosh, Judge - Case No. 2010 CF 001608A

Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Tamara Milosevic, Assistant Attorney General, Miami, Florida,

for Appellee